**UNITED STATES of America**
**Plaintiff-Appellee,**

v.

**GASOLINE RETAILERS ASSOCIATION, INC., General Drivers, Warehousemen and Helpers Union No. 142, an affiliate of International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and Michael Sawochka, Defendants-Appellants.**

**Nos. 13038–13040.**

United States Court of Appeals
Seventh Circuit.

Jan. 12, 1961.

Rehearing Denied Feb. 17, 1961.

Eugene D. Tyler, Hammond, Ind., Edward J. Calihan, Jr., Chicago, Ill., Albert H. Gavit, Gary, Ind., for appellants.

Donald L. Hardison, Atty., U. S. Dept. of Justice, Washington, D. C., Earl A. Jinkinson, Chicago, Ill., Robert A. Bicks, Asst. Atty. Gen., Joseph A. Prindaville, Jr., Harold E. Baily, Chicago, Ill., Richard A. Solomon, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

This appeal is from a judgment of the United States Court for the Northern District of Indiana, Hammond Division, entered on a finding that the defendants, Gasoline Retailers Association, Inc., General Drivers, Warehousemen and Helpers Union No. 142, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and Michael Sawochka, were guilty on a one count indictment charging the said defendants and others with conspiring to violate Section 1, Title 15 U.S. C.A. commonly known as the Sherman Act. The defendants waived a jury, and the judgment was entered upon findings made pursuant to rule 23(c) of the Federal Rules of Criminal Procedure, 18 U.S. C.A., after a bench trial by the Court. The indictment charged defendants and others with conspiring to stabilize the retail price of gasoline in the Calumet Region.

The defendant Gasoline Retailers Association, Inc., which was an unincorporated association of filling station operators was fined $5000; the defendant Local No. 142 was fined $5000; and the defendant Michael Sawochka was fined $3000 and sentenced to a term of imprisonment for six months, which term was suspended.

The one count indictment charged that beginning in 1954 and continuing to the date of the indictment the defendants and the co-conspirators and other persons to the grand jury unknown had "engaged in a combination and conspiracy to stabilize the retail gasoline prices throughout the Calumet Region", an area described as including Lake County, Indiana and Calumet City, Illinois, in unreasonable restraint of interstate commerce. It was charged that there was a "continuing agreement among the defendants and co-conspirators" that the "major brand" and "independent brand" station operators would refrain from either advertising or giving premiums, including trading stamps, in connection with the retail sales of gasoline; and that major brand station operators would refrain from advertising the retail price of gasoline by any means other than the price computing mechanism that constitutes a part of the gasoline dispensing devices. It was further charged that the defendants and co-conspirators enforced their agreement by picketing and threatening to picket, and by cutting off and threatening to cut off the supplies of gasoline of station operators who advertised retail prices except as permitted or who advertised or issued premiums in connection with retail sales. It was alleged that the effects of the combination and conspiracy were (a) to stabilize retail gasoline prices; (b) to suppress price competition among gasoline retailers; (c) to burden and impede interstate commerce in gasoline; and (d) to restrain the freedom of gasoline retailers in the conduct of their business.

The Union and the station operators in the area, in an effort to eliminate price wars, have included in their labor contracts clauses which prohibit major brand station operators from displaying the retail price of gasoline on the station

premises by any manner other than the price computing device on the gasoline pump, and banning the use of premiums or trading stamps by any station operator in connection with retail sales.

At least 95% of all the labor contracts of Local 142 in existence at the return of the indictment had been personally negotiated by the defendant Sawochka, the Union's chief negotiator and executive officer. Approximately 146 separate operators out of an association membership of 206 dealers had signed the service station contracts. There were 167 association members who were regular members of the Union. The operators who were not selling gasoline of the major oil companies such as Standard, Shell, etc. were not required to adhere to the price advertising ban since they needed to advertise their generally lower prices in order to compete with the major brand stations. The differential between the major oil companies and the so-called independents was approximately three cents per gallon and there was evidence that the Union and the Association had agreed that if this differential were maintained they would be permitted to display price signs. However, they were not allowed to give premiums with the sale of gasoline. On several occasions during the period covered in the indictment several stations began to advertise their prices by means of large price display signs and to initiate trading stamp programs. When this happened, regardless of whether the station was a party to the agreement, members of the Association and Union would visit the person who was using price signs or trading stamps and indicate unless the signs came down and the stamp and premium programs ended the station would be picketed and the delivery of gasoline halted. The evidence shows that at least one station was picketed by the Union and a tank wagon of gasoline was diverted from the intended destination when the driver refused to cross a Teamster picket line.

The contested issues are:

(1) Did the district court err in finding that an agreement among competitors to stabilize the local retail gasoline market, in an effort to prevent gasoline price wars, by the elimination of price advertising at the station sites and by the prohibition of the use of premiums and trading stamps constituted a price-fixing device in *per se* violation of the Sherman Act?

(2) Does a restraint in the form of a conspiracy to stabilize local gasoline retail prices, enforced by cutting off deliveries of gasoline and threats thereof, affect interstate commerce to an extent prohibited by the Sherman Act, or involve a conspiracy "in interstate commerce" in view of the continuous flow of gasoline from out of state into the local area through tanks of the retail dealer to the ultimate consumer?

(3) Is an indictment charging a conspiracy in restraint of trade fatally defective because it fails to specify the names of such co-conspirators whose identities were known to the grand jury?

(4) Does a union official who responds to a grand jury subpoena *duces tecum*, although he is neither personally named or served, for the sole purpose of producing and identifying official union documents acquire personal immunity from prosecution under an indictment returned against him?

(5) Was there evidence to sustain the conviction against the Union?

Appellants do not deny that they agreed and acted in concert to eliminate price advertising at the stations and to prevent the stations from giving premiums, largely of the trading stamp variety. Nor do they dispute that these efforts, with some minor exceptions, have proved successful largely through the threats of picketing or of cutting off noncooperating dealers from their source of supply, and occasionally making good on these threats. Instead, their argument is that suppression of the price advertising and the giving of premiums does not in itself constitute price-fixing and, therefore, to the limited extent, if any, it may have affected the ultimate price at which gasoline was sold in the area, the practices cannot properly be classified

*per se* offenses, but instead come under the rule of reason. Considered as such, both of the prohibitions are alleged to have been justifiable efforts to eliminate allegedly harmful activities.

■ It is established "that the offense of conspiring under the Sherman Act [Section 1] is complete when the agreement or conspiracy is formed." United States v. New York Great Atlantic & Pacific Tea Co., 5 Cir., 1943, 137 F.2d 459, 463. The Supreme Court expressly stated on this point in United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 224, n. 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129 that Section 1 condemns concerted action to fix prices even though such activity "be wholly nascent or abortive."

■ The basic objective of defendants' conspiracy was the stabilization of retail gasoline prices. Witness Patton testified the Union representative Frank Potesak told him that the anti-price sign provision "was put in there to keep price wars out of Lake County". The defendants similarly considered premium offers, and particularly trading stamps, as playing a similar role in initiating or continuing the price wars, and as such to be eliminated. The continuing agreement among the defendants and the co-conspirators that the "major brand" and "independent brand" station operators would refrain from either advertising or giving premiums, including trading stamps in connection with the retail sales of gasoline, and that "major brand" stations would refrain from advertising retail prices excepting at the sites of the stations by the regular price computing gasoline pumps is a *per se* violation of the Sherman Act. A similar situation was presented in the leading case of United States v. Socony-Vacuum Oil Company, 310 U.S. 150, 60 S.Ct. 811, which seems to settle this question. In that case there was an agreement among the large producers to purchase surplus, "distress gasoline" from smaller refiners which was flooding the so-called "spot market" and leading to price wars. The court rejected the argument that the "price fixing" it had found to be a *per se*

offense in United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, was limited to an agreement that a specified price would be charged by each conspirator. The court held (310 U.S. at page 222, 60 S.Ct. at page 843):

"Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible. Price-fixing as used in the Trenton Potteries case has no such limited meaning. An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used."

In the Socony-Vacuum case the activities were not concerned with direct price fixing but were aimed rather at affecting the market price and the court was there condemning as price fixing any concerted scheme designed to affect prices. We are of the opinion that the agreement and the activities in the present case are a *per se* violation of the Sherman Act.

■ There was a regular movement of substantial quantities of gasoline from producing areas outside the State of Illinois and Indiana to refineries and bulk plants in those States and thence to the individual station operators within the Calumet Region, which includes areas in both Indiana and Illinois. Therefore it is our opinion that the conspiracy to stabilize local gasoline retail prices affected Interstate Commerce and is a violation of the Sherman Act.

It is contended by appellants that the indictment was insufficient and should have been dismissed because it failed to list the names of some of the co-conspirators whose names were known to the government and the grand jury.

■ Rule 7(c) of the Federal Rules of Criminal Procedure provides that the indictment shall be "a plain, concise and definite written statement of the essential facts constituting the offense charged" and "need not contain * * * any other matter not necessary to such statement."

The indictment in this case did set forth "essential facts" constituting the offense of conspiracy in restraint of trade, and there was no need to set out the particular names or identity of possible witnesses who at the trial might prove to have been co-conspirators. United States v. Glasser, 7 Cir., 1941, 116 F.2d 690. We are of the opinion that it was not necessary for the indictment to specify the names of co-conspirators even though they were known to the grand jury.

█ Michael Sawochka appeared voluntarily before the grand jury to deliver Union documents and was informed that the questioning would be strictly limited to identification of the documents and to determination of compliance with the terms of the subpoena directed to Local 142, to which no immunity could be acquired. Even where the appearance is in response to a subpoena personally naming him a corporate or union official who appears only for such purposes as identification of corporate or union records or documents acquires no immunity under 15 U.S.C.A. §§ 32, 33. Cf. Heike v. United States, 1913, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450. Certainly no immunity attached under the circumstances here presented.

██ We find no merit in the contention of Local 142 that the evidence does not sustain its conviction. Unlike the situation in Truck Drivers Local No. 421, etc. v. United States, 8 Cir., 128 F.2d 227, relied upon by this appellant, the conspiracy was here formalized in two clauses of the official labor contract entered into by and on behalf of the Union and negotiated by the Union representative authorized to negotiate all of its contracts with all industries. And it was enforced by the Union's picketing. The activities here were neither unauthorized by nor unknown to the Union. That the Union included members other than those engaged in the service station industry does not under the circumstances here presented insulate it from liability. It was pointed out in United Brotherhood of Carpenters v. United States, 330 U.S. 395, 410, 67 S.Ct. 775, 783, 91 L.Ed. 973 that:

"The grant of authority to an officer of a union to negotiate agreements with employers regarding hours, wages, and working conditions may well be sufficient to make the union liable. An illustrative but not restrictive example might be where there was knowing participation by the union in the operation of the illegal agreement after its execution."

We have considered all other arguments advanced by counsel in briefs or oral arguments in arriving at our conclusion that the District Court's judgment must be affirmed.

Affirmed.