**STATE OF ARIZONA, in its own behalf and on behalf of its agencies, departments, commissions and political subdivisions, et al., Plaintiffs,**

v.

**COOK PAINT AND VARNISH COMPANY, a Delaware Corporation, et al., Defendants.**

**Civ. No. 73–562–PHX–CBR.**

United States District Court,
D. Arizona.

March 13, 1975.

Robins, Davis & Lyons, James L. Fetterly, Minneapolis, Minn., Fennemore,

Craig, von Ammon & Udall, Calvin H. Udall, Phoenix, Ariz., for plaintiffs.

Gust, Rosenfeld, Divelbess & Henderson, Richard A. Segal, Phoenix, Ariz., Blackwell, Sanders, Matheny, Weary & Lombardi, William H. Sanders, David C. Trowbridge, Kansas City, Mo., for Cook Paint and Varnish Co.

Ryley, Carlock & Ralston, G. Read Carlock, Phoenix, Ariz., for The Flintkote Co.

Snell & Wilmer, John J. Bouma, Phoenix, Ariz., Brobeck, Phleger & Harrison, Moses Lasky, San Francisco, Cal., for PPG Industries, Inc.

Evans, Kitchel & Jenckes, N. R. Porter, Phoenix, Ariz., for Reichhold Chemicals, Inc.

Jennings, Strouss & Salmon, Charles R. Hoover, Phoenix, Ariz., Covington & Burling, Henry P. Sailer, Washington, D. C., for Upjohn Co.

## MEMORANDUM OF OPINION

RENFREW,[*] District Judge.

■■ On September 14, 1973, plaintiffs brought this action on behalf of themselves and on behalf of other members of a purported class[1] consisting of all commercial, industrial, agricultural and governmental users of rigid polyurethane foam insulation products against five defendants, who are alleged to have manufactured and marketed these products under various trade names during the years 1965 to the filing of the action. Plaintiffs' complaint, as amended, contains four counts: count one alleges a conspiracy and combination by defendants to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S. C. § 1; count two is predicated on a theory of strict liability in tort; count three charges the defendants with negligence; and count four alleges fraudulent representation. Jurisdiction as to count

---

[*] United States District Judge for Northern District of California sitting by designation in District of Arizona.

1. In view of the Court's disposition of the plaintiffs' claims, as set forth in the final order and judgment entered on November 13, 1974, and as described in this opinion, the Court does not reach the issues concerning the appropriateness of maintaining any or all of those claims as a class action. Nonetheless, in view of the extensive briefing and argument by the parties on these issues, the Court finds it appropriate to briefly address them.

The Court has the gravest doubts about the propriety of allowing any of plaintiffs' claims to proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure. With respect to Count One, it is apparent that most or all of the purported class members are "indirect purchasers" from the defendants. Thus, in addition to the individual question of amount of damages, there would be presented, with respect to each class member, the individual question of proof of injury or "impact", an essential substantive element of antitrust liability. The presence of this individual question alone would probably bar class action treatment of Count One, see Kline et al. v. Coldwell, Banker, & Co., et al., 508 F.2d 226, 233–235 (9th Cir. 1974); see also City and County of Denver v. American Oil Co., 53 F.R.D. 620 (D.Colo.1971),

although it is by no means the only obstacle which confronts the plaintiffs in this regard.

With respect to Counts Two, Three and Four, many factors militate against maintaining these claims as a class action, two of which should be noted at this stage. First, purported class members are almost certainly located in virtually every state. As a result, the resolution of these three claims with respect to individual class members would involve the application of state substantive tort rules which differ significantly in many instances and subtly in others. Second, and perhaps even more significantly, the Court is convinced that the claims of some of the unnamed class members do not meet the jurisdictional amount requirement of 28 U.S.C. § 1332. It is now beyond question that the claims of these class members must be dismissed for want of jurisdiction. See Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). Further, any attempt to obviate this problem by defining the class in terms of those purported class members with claims in excess of $10,000 would raise grave and, in the Court's view, insurmountable feasibility problems. For an excellent discussion of these problems, see Zahn v. International Paper Co., 53 F.R.D. 430, 433–444 (D.Vt.1971), affd. 469 F.2d 1033 (2d Cir. 1972), affd. 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).

one is invoked pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and as to counts two, three and four pursuant to 28 U.S.C. § 1332, by virtue of diversity of citizenship.

Although plaintiffs' claims will be set forth in detail below, essentially all four counts revolve around alleged flammability characteristics of the polyurethane foam insulation products manufactured and marketed by defendants, and alleged misrepresentations concerning those characteristics.

After two pretrial conferences, at which numerous motions by various parties were heard, the Court, by order dated November 13, 1974, directed that final judgment be entered in the action. At the request of plaintiffs, count four was dismissed without prejudice as to all defendants and counts two and three were dismissed without prejudice as to two of the defendants. For the reasons developed in the opinion below, count one was dismissed with prejudice as to all defendants, and counts two and three were dismissed with prejudice as to the three remaining defendants.

### Count One

In their original complaint plaintiffs enumerated some eleven purposes of the defendants' purported conspiracy and combination in restraint of trade. For purposes of analyzing the antitrust implications of this conspiracy, the most important of these alleged purposes were the following: (1) "[a]ctively misrepresenting the flammability characteristics of the product and concealing from distributors, specifiers and users the true flammability characteristics of the product, all for the purpose of restraining trade, increasing the price of the product to users and creating an artificial market for the product" and (2) "[f]ixing · uniform, arbitrary and non-competitive price levels at which the product is sold". Among the alleged effects of this conspiracy were that "[p]rices of the product sold by defendant corporations to plaintiffs and others were raised, fixed, stabilized, and maintained at non-competitive levels" and that "[c]ompetition between and among defendants was restricted and suppressed and purchasers of the product including plaintiffs, have been deprived of the benefits of free and open competition". At the first pretrial conference the Court noted the ambiguity inherent in plaintiffs' theory of antitrust liability: was the conspiracy charged a conspiracy to misrepresent the flammability characteristics of the product which had the effect of permitting the product to be sold at higher prices than would otherwise have prevailed or was it a conspiracy to establish higher prices for the product, pursuant to which defendants misrepresented its flammability characteristics? With candor much appreciated by the Court and in keeping the highest traditions of the profession, plaintiffs' counsel conceded, by letter dated September 11, 1974, that they had no evidence to support the latter formulation of the conspiracy. Accordingly, plaintiffs amended their complaint to reflect a theory which they believed the evidence would support. As amended, the complaint in the critical paragraph charges that defendants conspired to "actively misrepresent the flammability characteristics of the product and * * conceal from distributors, specifiers and users the true flammability characteristics of the product, for the purpose of restraining trade, creating an artificial demand for the product, and thereby raising and stabilizing the price of the product". Although the quoted language is not entirely free from ambiguity, in light of the plaintiffs' letter of September 11, 1974, and subsequent argument at the second pretrial conference on October 26, 1974, it is clear that the conspiracy charged is one the conscious purpose of which was the misrepresentation of flammability characteristics of polyurethane foam insulation products, and one of the effects of which was the raising and stabilizing of prices of those products. In support of their antitrust claim as reformulated, plaintiffs urge essentially two theories: first, that de-

fendants must be deemed to have intended the natural and probable consequences of their acts, a natural and probable consequence of the misrepresentations was the raising and stabilizing of prices, and therefore a constructive purpose of the conspiracy was price fixing, a *per se* violation of Section 1 of the Sherman Act, and second, that a conspiracy to engage in cooperative false advertising is, by itself, a conspiracy in restraint of trade proscribed by Section 1 of the Sherman Act.

Turning to the first of these theories, the Court finds that it far too broadly conceives the scope of conduct which has been, or ought to be, considered price fixing. Although plaintiffs have cited several cases which they believe support their constructive price fixing theory, an analysis of the facts in those cases reveals that they are inapposite to the situation presented here. In each case

an actual, as opposed to constructive, purpose of the conspiracy was to affect prices, though the means used to accomplish this objective were varied, and in some cases indirect.[2]

It might, of course, be argued, as plaintiffs eloquently urged, that the Court should break new ground by recognizing a doctrine of constructive price fixing in cases where a natural and probable effect, thought not an actual purpose, of the conspiracy or combination is to affect prices. This the Court declines to do. The range of collaborative conduct, the natural and probable consequence of which might be said to be an effect of some type on the price at which goods are sold, and thus the range of conduct embraced by such a doctrine, is almost limitless. Following the logic of plaintiffs' theory to its inexorable conclusion, all such conduct would be

2. The four price-fixing cases cited by plaintiffs are United States v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1939) ; National Macaroni Manufacturers Association v. F.T.C., 345 F.2d 421 (7th Cir. 1965) ; United States v. Gasoline Retailers Ass'n, Inc., 285 F.2d 688 (7th Cir. 1961) ; and Plymouth Dealers Ass'n of Northern California v. United States, 279 F.2d 128 (9th Cir. 1960).

United States v. Socony Vacuum Oil Co., involved a scheme whereby certain oil companies engaged in a gasoline buying program designed to eliminate so-called "distress gasoline" from the spot tank car market. The supply of distress gasoline had been a depressing influence on the price levels in the spot tank car market and its elimination had the effect of raising the price levels in that market, which in turn resulted in a higher price in the retail market. The Court found that the buying programs "had as their direct purpose and aim the raising and maintenance of spot market prices and of prices to jobbers and consumers in the Mid-Western area * * *." 310 U.S. at 216, 60 S.Ct. at 841.

In National Macaroni Manufacturers Association v. F.T.C., defendants agreed to fix or establish the brands or proportions of ingredients to be used in the manufacture of macaroni products. The Federal Trade Commission found that "the agreement was intended to ward off price competition for durum wheat in short supply by lowering total industry demand to the level of the available

supply." 345 F.2d at 426. The court found that substantial evidence supported this finding and approved the Commission's cease and desist order. 345 F.2d at 427.

In United States v. Gasoline Retailers Ass'n, Inc., the alleged violation of Section 1 of the Sherman Act was a continuing agreement among defendants to refrain from price advertising and the giving of premiums, including trading stamps, in connection with retail sales of gasoline. The court found that "[t]he basic objective of defendants' conspiracy was the stabilization of retail gasoline prices", 285 F.2d at 691, and affirmed the defendants' conviction.

Plymouth Dealers Ass'n of Northern California v. United States involved the preparation and distribution of a fixed uniform list price by dealers marketing a particular brand of automobile for use in making pricing decisions. With respect to the use of this list the court noted that "[i]t *was* an agreed starting point; it had been agreed upon between competitors; it was in some instances in the record respected and followed; it had to do with, and had its effect upon, price", (emphasis in original), 279 F.2d at 132, and affirmed defendants' conviction.

Each of these cases contains a common element: in sustaining the finding of a price fixing conspiracy, the court found that an actual, conscious purpose of the conspiracy was to affect price in some manner. As such, they simply do not furnish support for plaintiffs' constructive purpose theory.

*per se* violative of Section 1 of the Sherman Act.

Such a result manifestly would be inconsistent with the justification for *per se* rules under Section 1. The Supreme Court has explained it thusly: "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). With respect to the application of this standard, the Supreme Court has noted that "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of. the Sherman Act." United States v. Topco Associates, 405 U.S. 596, 607–608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). A classic example of such a relationship is one whose actual purpose is to affect or regulate prices. By contrast courts do not have similar experience in dealing with the myriad types of relationships, business and otherwise, a natural and probable consequence of which may be to affect prices in some manner. Indeed many such relationships could not be deemed restraints of trade, let alone unreasonable restraints of trade, within the purview of the Sherman Act.[3]

The constructive price fixing theory, therefore, is an unsuitable vehicle with which to analyze the antitrust implications of the conduct alleged here. Rather it must be asked, in the first instance, whether cooperative false advertising is a restraint of trade, and if so, it must further be asked whether the restraint is unreasonable. Plaintiffs' second theory of antitrust liability is predicated upon affirmative answers to both of these questions. Accordingly, the Court addresses the issue of whether cooperative false advertising is a restraint of trade within the purview of the Sherman Act.

To support their contention that cooperative false advertising is such a restraint, plaintiffs rely upon a series of cases decided under Section 5 of the Federal Trade Commission Act, 15 U.S.C.

---

3. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), provides an excellent example of this point. The case involved a strike by a labor organization during which a manufacturing plant was occupied, much equipment and property was destroyed, the plant's operations were suspended for three months, and the shipment of many completed goods was delayed. The Supreme Court held that these facts did not establish a conspiracy in restraint of trade within the purview of the Sherman Act, 310 U.S. at 512–513, 60 S.Ct. 982, even though the Court found that a substantial amount of interstate commerce was affected, 310 U.S. at 484, 60 S.Ct. 982. Although the Court noted that "[s]o far as appears the delay of these shipments was not intended to have and had no effect on prices of hosiery in the market * * *", 310 U.S. at 501, 60 S.Ct. at 996, the Court did not similarly consider certain other aspects of defendants' behavior. If the constructive purpose theory urged by plaintiffs here were an accurate statement of the law, such a consideration would have mandated a finding of Section 1 liability. A natural and probable consequence of destroying equipment and property is to increase the manufacturers' costs to cover replacement and repair. In turn a natural and probable consequence of an increase in the manufacturers' costs is an increase in the price of his goods. Thus under the constructive purpose theory, a conspiracy to destroy equipment is a price fixing conspiracy, a *per se* violation of the Sherman Act. Such a result would no doubt have surprised the Court in *Apex*. Indeed the Court there noted that "[i]t is not seriously contended here that a conspiracy to derail and rob an interstate train, even though it were laden with 100,000 dozen pairs of stockings, necessarily would involve a violation of the Sherman Act." 310 U.S. at 486–487, 60 S.Ct. at 988. Under plaintiffs' constructive purpose theory and the analysis suggested above, such a contention would be serious indeed.

The Court need not belabor this point further. It does not require a particularly fertile imagination to realize the potentially limitless scope, and therefore inappropriateness,. of a constructive price fixing doctrine. The Court thus declines to establish such a doctrine in this case.

§ 45.[4] The leading case of this group is Federal Trade Commission v. Winsted Hosiery Company, 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729 (1922). *Winsted* involved an action by the Federal Trade Commission against a manufacturer of underwear. This manufacturer had branded and labeled its merchandise by various terms signifying all wool when in fact none of the merchandise so labelled was all wool and some of the merchandise contained as little as ten per cent wool. The Commission found that this practice represented an unfair method of competition proscribed by Section 5 of the Federal Trade Commission Act, and the United States Supreme Court affirmed this conclusion.

Plaintiffs concede that presently the scope of conduct proscribed by Section 5 of the Federal Trade Commission Act is broader than that proscribed by Section 1 of the Sherman Act.[5] Plaintiffs contend, however, that, at the time *Winsted* was decided, the only difference in the coverage of these two provisions was the element of combination or conspiracy, a requirement for Sherman Act violations but not for those under the Federal Trade Commission Act. From this premise they argue that behavior of the type found to have occurred in *Winsted*, which is admittedly very similar to that alleged here, if coupled with a combination or conspiracy becomes a "clear cut violation" of Section 1 of the Sherman Act.

This argument is unpersuasive for two reasons. First, the conduct which occurred in *Winsted* did involve collaborative aspects which could easily have supported a finding of a combination or conspiracy if such a finding had been required. There the manufacturer did not sell directly to the public but sold to various retailers who sold to the public. It was conceded that many if not all of these retailers were fully aware of the deceptive labelling and used it as a means of deceiving the consuming public. Indeed one of the arguments made by the manufacturer in *Winsted* was that since it had not deceived its immediate purchasers, the retailers, it had not engaged in an unfair method of competition. In rejecting this argument, Justice Brandeis relied upon three cases, two of which explicitly described the relationship between the dishonest manufacturer who provides a retailer with a deceptive product and the retailer who uses such a product to deceive the public as one of "co-conspirators".[6] 258 U.S. at 494, 42 S.Ct.

---

4. See, *e. g.*, Federal Trade Commission v. Royal Milling Co., 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706 (1933); Federal Trade Commission v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931); Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729 (1922).

In their briefs plaintiffs have also cited, in support of their second theory of antitrust liability, several cases which suggest that a conspiracy to drive out of business, or destroy, a competitor is actionable under the antitrust laws. See, *e. g.*, California Motor Transport v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); Caldwell-Clements, Inc. v. Cowan Publishing Corp., 130 F.Supp. 326 (S.D.N.Y.1955).

That such behavior may give rise to claims under both Sections 1 and 2 of the Sherman Act was settled by the Supreme Court in Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). No such behavior is alleged here, however; nothing in plaintiffs' complaint,

briefs or argument suggests that a purpose or effect of the instant conspiracy was to drive a competitor or a class of competitors out of business. Accordingly the cases cited are not particularly helpful in analyzing the problem presented in this case.

5. See Federal Trade Commission v. Cement Institute, 333 U.S. 683, 694, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).

6. See Coca Cola Co. v. Gay-Cola Co., 200 F. 720 (6th Cir. 1912) and Von Mumm v. Frash, 56 F. 830 (E.D.N.Y.1893).

In *Von Mumm* the court described the relationship between manufacturer and retailer as follows: "The defendants make and sell, knowingly, the tools for fraud; and they, and the knaves who buy the tools of them, intending to use them for the fraudulent purpose for which they were constructed, are co-conspirators each guilty of the fraud perpetrated in pursuance of the intention with which the tools were made * * *." 56 F. at 836.

384. Such a conspiracy would, of course, be a "vertical" rather than a "horizontal" one, as charged here. It is beyond question, however, that, at the time *Winsted* was decided, vertical conspiracies or combinations were within the ambit of Section 1 of the Sherman Act. See, e. g., Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). The mere presence of a purported horizontal conspiracy in the instant case cannot, therefore, *a fortiori* convert *Winsted* into authority that the conspiracy is violative of Section 1 of the Sherman Act. Indeed, since *Winsted* quickly became the leading authority for the proposition that Section 5 of the Federal Trade Commission Act proscribes a broader range of conduct than that proscribed under the Sherman Act,[7] and since *Winsted* involved facts which could have supported a finding of conspiracy, *Winsted* represents much more persuasive authority for precisely the contrary conclusion.

The Court need not, however, rely solely on this analysis of *Winsted*, for there is a second flaw in plaintiffs' argument based upon that case. Even if it were to be conceded that *Winsted* in no way involved a conspiracy or combination, it does not follow from the holding in that case that the type of behavior found to have occurred there, if coupled with a conspiracy constitutes a violation of Section 1 of the Sherman Act. The Sherman Act does not proscribe every conspiracy the effect of which is some restriction on, or harm to, competition. See, *e. g.*, Apex Hosiery Co. v. Leader, 310 U.S. 469, 503, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). Rather, it is those conspiracies where the element of collaboration itself presents a special threat to competition at which the Sherman Act aims. Thus, though individually each competitor must set a price for its goods and determine the area in which to market them, when competitors collaborate to accomplish these tasks, competition is gravely threatened if not eliminated. Conversely, though individual competitors may harm competition by each falsely advertising its product, combining with other competitors marketing the same product to engage in this practice may not alter qualitatively the harm to competition.

Plaintiffs attempt to meet the thrust of this distinction by arguing that the conspiracy here suppressed competition among the defendants in areas where they would have competed absent their conspiracy. This assertion, however, flies in the face of common sense. The purpose of the conspiracy alleged here, in essence, was to actively conceal the true flammability characteristics of polyurethane foam insulation products. Accepting as accurate for purposes of this analysis the plaintiffs' description of the flammability characteristics, each of the defendants individually, with or without a conspiracy would have been required to conceal these flammability characteristics in order to insure the survival of its product as a marketable commodity. The assertion, then, that absent the conspiracy the defendants would have competed to reveal the actual flammability characteristics of polyurethane foam insulation products and that the conspiracy thus suppressed competition among them is simply untenable.

In sum, a careful reading of *Winsted* and an analysis of the characteristics of those conspiracies at which the Sherman Act is directed dictate the conclusion

---

In *Coca Cola Co.* the court observed: "[I]f these reasons lead to the issuing of an injunction against one of a large number of those who commit the final tort, even more do they indicate the necessity of an injunction against one who is conspiring or co-operating to cause a large number of such torts. Accordingly, we find it recognized by this court that, in a suit for unfair competition, it is not necessary to show that the immediate purchasers were deceived as to the origin of the goods; but even if they understand that they are buying the counterfeit, and not the genuine, the manufacturer of the counterfeit will be enjoined from selling it to dealers with the purpose and expectation that it shall be used by the dealers to deceive the consumer." 200 F. at 722–723.

7. See Federal Trade Commission v. R. F. Keppel & Bro., Inc., 291 U.S. 304, 310, 54 S.Ct. 423, 78 L.Ed. 814 (1933).

that the conspiracy alleged here is not a "conspiracy in restraint of trade" within the purview of Section 1 of the Sherman Act.

 Finally, strong policy considerations militate in favor of this result. The conduct alleged here, of course, would be clearly actionable under state law as a tort of misrepresentation. If conspiracies to misrepresent, such as the instant one, are deemed conspiracies in restraint of trade under the Sherman Act, a large area of state law would be subsumed under the federal antitrust laws. The Supreme Court has indicated that this is an important consideration in determining the coverage of the Sherman Act: "The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance. An intention to disturb the balance is not lightly to be imputed to Congress." Apex Hosiery Co. v. Leader, 310 U.S. 469, 513, 60 S.Ct. 982, 1002, 84 L.Ed. 1311 (1940). The availability of proceedings under Section 5 of the Federal Trade Commission Act[8] fully vindicates any federal interest in preventing the type of conduct alleged here. It is most appropriate, therefore, to leave to state tort law the private redress of any injury suffered as a result of that conduct.

For the foregoing reasons count one of plaintiffs' complaint has been dismissed with prejudice as set forth in the final order and judgment entered November 13, 1974.

### Counts Two and Three

Counts two and three of plaintiffs' complaint are predicated upon theories, respectively, of strict liability in tort and negligence. Though the theories differ significantly, for purposes of the defendants' motion to dismiss, they presented the same issue and will, therefore, be considered together.

The common question, upon which the disposition of counts two and three turns, is whether the injury allegedly suffered by plaintiffs is the type of injury which is actionable under theories of strict liability and negligence. In both counts two and three plaintiffs alleged that they have been damaged as follows:

"(a) Plaintiffs' buildings and structures have been physically altered or changed, and have incurred physical harm and damage;

"(b) The safe use and occupancy of Plaintiffs' buildings and structures have been unreasonably restricted or prevented in that Plaintiffs cannot carry on normal activities which require or involve heat, sparks or flame, because of the extreme danger of fire to their buildings and structures caused by the installation of Defendants' defective, unreasonably dangerous and negligently manufactured product;

"(c) In order to make their commercial buildings and structures reasonably fire safe, it will be necessary for Plaintiffs to physically sever or tear Defendants' product from the interior surfaces of their buildings and structures, which will necessarily result in additional physical harm and damage to said buildings and structures;

"(d) Plaintiffs' buildings and structures have become incapable of reasonably safe habitation, use or occupancy;

"(e) The market value of Plaintiffs' buildings and structures has been diminished and their marketability impaired;

"(f) Plaintiffs' buildings and structures have become veritable firetraps and many of Plaintiffs are subject to orders or restrictions imposed by fire prevention or other local authorities limiting or wholly preventing the use and occupancy of their buidings and structures."

---

8. At the second pretrial conference on October 26, 1974, counsel for defendants represented that such an action is presently pending against members of the polyurethane foam insulation industry.

■ Although the law of some five states is potentially relevant in disposing of these counts,[9] plaintiffs have conceded that under the law of all relevant states and under the Restatement (Second) of Torts the types of injury which are actionable under theories of strict liability and negligence include physical harm to property but do not include economic loss, loss of bargain, loss of profits and the like.[10]

■ Whether the type of damage described in plaintiffs' complaint, as set forth above, constitutes physical harm to property or instead some form of "economic loss" presents, therefore, the dispositive question here. Of the enumerated injuries only subparagraphs (a) and (c) even arguably involve physical harm to property. Upon analysis these too fail to state a claim for the appropriate type of injury.

The draftsmen of the Second Restatement of Torts noted, as a primary justification for the development of strict liability for defective products, that "public policy demands that the burden of accidental injury caused by products intended for consumption be placed upon those who market them * * *."[11] In what is perhaps the leading case on the distinction between physical injury and economic loss for purposes of strict liability and negligence actions, Chief Justice Traynor of the California Supreme Court observed that "[t]he distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not

arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." Seely v. White Motor Co., 63 Cal.2d 9, 18, 45 Cal.Rptr. 17, 23, 403 P.2d 145, 151 (1965).

Even accepting as true plaintiffs' allegation that the installation of defendants' product physically altered their buildings and structures, application of the foregoing principles precludes recovery here on the tort theories of negligence and strict liability. The alteration of the structures was by no means accidental, but was intended; it was not a risk to which plaintiffs were subjected, it was a certainty. The harm to plaintiffs, if any, results not from the fact of the alteration, but from the failure of the bargained for alteration to meet the

9. Neither side disputes that these are Arizona, California, Hawaii, Texas and Alaska.

10. Both Section 402A ("Special Liability of Seller of Product for Physical Harm to User or Consumer") and Section 395 ("Negligent Manufacture of Chattel Dangerous Unless Carefully Made") of the Restatement (Second) of Torts prescribe "liability for physical harm". With respect to the cases in the relevant states which apply these two doctrines, plaintiffs have conceded that they support the distinction between physical harm and economic loss. In plaintiffs' brief this concession was qualified by the use of the word "arguendo". This qualification, however, is without significance here; the foot-

note to the word reveals that its use was intended to reflect plaintiffs' belief that the better rule of law would be to allow recovery for economic loss alone under theories of strict liability and negligence. See, e. g., Santor v. A & M Karagheusian, Inc., 44 N. J. 52, 207 A.2d 305 (1965). Plaintiffs, however, make no argument that this rule of law is followed in any of the relevant states; they do not dispute defendants' assertion that these states follow the contrary and majority rule exemplified by the leading case of Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965).

11. Restatement (Second) of Torts, Section 402A, comment c (1965).

plaintiffs' expectations in terms of performance.

Further, the possibility that in order to remedy the failure of the product to meet the plaintiffs' expectations, procedures may have to be employed which will damage the structures in some way does not constitute the kind of accidental injury against which the doctrines of strict liability and negligence are designed to protect the consuming public. Rather, it represents mere possible consequential damage flowing from the failure of the product to meet expected standards of performance.[12]

For the foregoing reasons counts two and three of plaintiffs' complaint have been dismissed with prejudice against defendants The Flintkote Company, PPG Industries, Inc., and Upjohn Company as set forth in the final order and judgment entered November 13, 1974.

12. For the proposition that such damages are not recoverable on a theory of strict liability, see Southwest Forest Industries, Inc. v. Westinghouse Electric Corp., 422 F. 2d 1013, 1020 (9th Cir. 1970). The Court of Appeals did not reach the issue of recovery for such damages under a theory of negligence since it found a valid waiver of any liability under such a theory. 422 F.2d at 1020. The court in no way intimated, however, that the result would be different under a theory of negligence; indeed, the district court had determined that "there also can be no recovery for consequential damages based upon a theory of negligence * * *." 422 F.2d at 1019.