CATALANO, INC., et al., on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,

v.

TARGET SALES, INC., et al., Defendants-Appellees.

Nos. 77–2221, 77–2222.

United States Court of Appeals, Ninth Circuit.

Aug. 20, 1979.

Rehearing Denied Oct. 23, 1979.

James P. Samarco, Fresno, Cal., William L. Riley, Orrick, Herrington, Rowley & Sutcliffe, Jack B. Owens (argued), San Francisco, Cal., for plaintiffs-appellants.

G. Richard Doty, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., J. Wallace Upton, Kimble, MacMichael, Jackson D. Upton, Fresno, Cal., Ted R. Frame, Frame & Courtney, Coalinga, Cal., for defendants-appellees.

Before WALLACE and SNEED, Circuit Judges, and BLUMENFELD *, District Judge.

SNEED, Circuit Judge:

Plaintiffs, a conditionally certified class of beer retailers doing business within the Fresno area, appeal from a ruling that defendants' alleged credit fixing agreement was not *per se* illegal, but rather must be proven illegal under the rule of reason standard. Catalano, Inc. and C & C Food Marts, Inc. (hereinafter Catalano), two named plaintiffs, also appeal from a summary judgment of the district court adjudging that neither plaintiff had suffered injury in fact. Both appeals were consolidated. We affirm the district court's ruling that credit fixing, standing alone, was not an agreement to fix prices subject to a *per se* rule of illegality. We reverse the district court's entry of summary judgment against Catalano and remand Catalano's claim for further proceedings.

## I. FACTUAL BACKGROUND

Plaintiffs-appellants claim that defendants-appellees, various beer wholesalers, have engaged in a conspiracy to restrain trade violative of section 1 of the Sherman Act.[1] The class of plaintiff retailers sought to establish, *inter alia*, that the defendant wholesalers conspired to eliminate deferred payment terms, specifically short term trade credit formerly granted to them on beer purchases.[2]

Plaintiffs sought an order from the district court declaring the alleged credit fixing agreement, if proven, violative *per se* of the antitrust laws. The district court refused to so rule. Plaintiffs then sought an interlocutory appeal from the district court's ruling on the *per se* issue pursuant to 28 U.S.C. § 1292(b). The district court

---

* Honorable M. Joseph Blumenfeld, Senior District Judge for the District of Connecticut, sitting by designation.

1. 15 U.S.C. § 1.

2. The district court conditionally certified plaintiffs' class to include those retailers to whom the wholesalers extended credit prior to the alleged agreement to terminate the credit provisions.

properly certified the issue and we granted permission to appeal.

Contemporaneous with the request for the order declaring credit fixing a per se violation, defendants sought a motion for summary judgment against plaintiffs Catalano asserting that they failed to establish injury in fact. The district court agreed, granted the motion for summary judgment, and Catalano appealed therefrom.

We granted a motion to consolidate the two appeals.

## II. QUESTIONS PRESENTED

Two issues are presented by these appeals. First, did the district court err by ruling that a horizontal agreement among wholesalers to eliminate credit on retail sales would not constitute a per se violation of the antitrust laws? Second, did the district court err by granting summary judgment against plaintiffs Catalano on the ground that they failed to demonstrate the existence of any injury in fact? We shall turn first to the per se issue.

## III. THE PER SE ISSUE

■ To support their contention that an alleged horizontal agreement among beer distributors to eliminate formerly free short term trade credit should be considered as illegal per se, plaintiffs argue that: (1) Price fixing is subject to a per se evaluation under the Sherman Act.[3] (2) Under the pertinent standard price fixing may be accomplished directly or indirectly.[4] (3) An agreement to fix credit terms fixes prices indirectly. (4) As a result, credit fixing is a per se violation of the antitrust laws.

We cannot agree that on this record an agreement to fix credit terms amounts to indirect price fixing within the meaning of the antitrust laws. *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), established the rationale for per se illegality in antitrust suits: "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Particular acts, of which price fixing is one, have been held so plainly anti-competitive as to be conclusively presumed illegal. The fixing of credit terms, on the other hand, is not "manifestly anticompetitive." An agreement to fix credit, a "non-price" condition of sale, may actually enhance competition. Proper analysis reveals "that an agreement fixing non-price trade items may either help or hurt competition, depending upon industry structure." L. Sullivan, *Handbook of the Law of Antitrust,* § 99, at 277 (1977).[5] Thus, an agreement to eliminate credit could sharpen competition with respect to price by removing a barrier perceived by some sellers to market entry. Moreover, competition could be fostered by the increased visibility of price made possible by the agreement to eliminate credit. For example, an agreement to eliminate credit might foster competition by increasing the visibility of the price term, and hence, promote open price competition in an industry in which imperfect information shielded various sellers from vigorous competition.

**3.** *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**4.** *Plymouth Dealers Assoc. v. United States,* 279 F.2d 128 (9th Cir. 1960); *National Macaroni Mfrs. Assoc. v. Federal Trade Commission,* 345 F.2d 421 (7th Cir. 1965).

**5.** The effects of an agreement standardizing non-price terms will vary much as will an agreement standardizing product. By such standardization the variety of offerings open to buyers and competitive differentiation open to sellers will inevitably be reduced, as they are when the product is standardized. . . . But the standardization of non-price terms, like standardization of product, will have other effects. It will in a sense serve to channel all transactions into a single, better integrated market; buyers will more easily be able to compare their alternative opportunities as to the unstandardized terms, most notably price, and sellers will more likely be aware of competitive offerings.
L. Sullivan, *supra,* § 99, at 277–78.

■ We readily acknowledge that an agreement to fix credit may be in violation of the antitrust laws when made pursuant to a conscious purpose to fix prices or as part of an overall scheme to restrain competition. *See Arizona v. Cook Paint & Varnish Co.,* 391 F.Supp. 962, 966 n.2 (D.Ariz. 1975), *aff'd,* 541 F.2d 226 (9th Cir. 1976); *Wall Products Co. v. National Gypsum Co.,* 326 F.Supp. 295 (N.D.Cal.1971). Thus, were competition with respect to price primarily centered on credit terms, as where, for example, explicit prices are fixed by government, an agreement to fix credit terms would amount to price fixing. And, of course, an agreement to fix credit terms as part of an effort to fix prices would contravene the antitrust law.

At this juncture of the proceeding it has not been established that the agreement was entered into with the purpose, or had the effect, of restraining price competition in the industry. Simply labeling concerted conduct as price fixing without proof of purpose to affect price will not justify application of a *per se* rule. "The antitrust laws concern substance, not form, in the preservation of competition." L. Sullivan, *supra,* § 74, at 198. As a result, we refuse to characterize the credit fixing agreement here before us as price fixing.

Our conclusion is reinforced when we consider the function of *per se* rules in antitrust law enforcement. A particular practice which is established as *inherently* anti-competitive eliminates the need for elaborate analysis and may be deemed illegal *per se.* Determination of the applicability of *per se* illegality turns on whether the practice "appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to 'increase economic efficiency and render markets more rather than less competitive.'" *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979); *United States v. United Gypsum Co.,* 438 U.S. 422, 441 n.16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *see Continental T. V., Inc. v. GTE Sylvania,* 433 U.S. 36, 50 n.16, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977);

*Northern Pacific Ry. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). We cannot say that credit term fixing "would always or almost always tend to restrict competition and decrease output." It is better, we believe, to rest an antitrust violation on demonstrable economic effects rather than "formalistic line drawing." *Continental T. V., Inc. v. GTE Sylvania, supra,* 433 U.S. at 59, 97 S.Ct. 2549. Thus, to determine the legality of credit fixing an evaluation of the competitive detriment or enhancement must be made in each situation.

■ Application of the rule of reason, however, does not necessitate invariably the conclusion that a horizontal agreement to eliminate trade credit is lawful. Under the rule of reason any concerted action violates the Sherman Act if its purpose or effect would significantly impair competition. The rule of reason, moreover, "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). It requires examination of the impact of credit fixing on competitive conditions, and such an agreement can benefit competition only if it improves the operation of the market. L. Sullivan, *supra* § 100 at 280.

■ Any argument that the special characteristics of the beer industry render monopolistic arrangements better for trade and commerce than competition is foreclosed. *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 689, 98 S.Ct. 1355.

The Sherman Act reflects a legislative judgment that ultimately competition will not only produce lower prices, but also better goods and services. "The heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. F.T.C.,* 340 U.S. 231, 248, 71 S.Ct. 240, 95 L.Ed. 239. The assumption that competition is the best method of allocating resources in a

free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers. Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad.

*Id.* at 695, 98 S.Ct. at 1367. The underlying premise is that "unless the market is rigged, either by concerted agreement . . or by excessive concentration and interdependent action, the market when left alone ought to adjust to consumer interests with responses at least as fine as those which the industry could concertedly agree upon." L. Sullivan, *supra*, § 100, at 281.

Application of the rule of reason to the facts presented here may be unlikely to require an elaborate inquiry into the effects on the beer industry. A horizontal agreement among distributors eliminating deferred payment terms, while leaving all other terms subject to competitive forces, may well be unreasonable. Such an agreement tends to impair competition. The ease with which the rule of reason may be applied in this case does not, however, justify the invocation of a *per se* rule. We must remain open to the possibility that situations will occur where such an agreement might work to increase competition. *See id.,* § 100, at 281.

## IV. SUMMARY JUDGMENT

■ Turning to the summary judgment against Catalano, we note that under Fed.R.Civ.P. 56(c) "[t]he burden is on the party moving for summary judgment to show the absence of any genuine issue of material fact, and, in determining whether the burden has been met, . . . [the court] must draw all inferences of fact against the movant and in favor of the party opposing the motion." *Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 683 (9th Cir. 1976), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). Once it appears from the movant's

papers that the motion should be granted, the opposing party must controvert the showing. All evidence and inferences are to be viewed in a light most favorable to the party opposing the motion. *Mutual Fund Investors v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir. 1977). In the antitrust context the general standards for the granting of summary judgment are applied even more stringently. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

■ The district court concluded that the cessation of credit on wholesale distribution caused no injury in fact to plaintiffs. Summary judgment against plaintiffs Catalano was based upon a determination that there was no genuine issue of material fact regarding the injury issue. This, in turn, rested upon the deposition of Joseph Catalano, principal owner of the two Catalano businesses. He stated that, except for the possibility of selling more beer, paying cash for beer had no effect on profit and loss. Also, he could not estimate how much more profit might have been made had beer been sold on credit.

Opposing the motion, plaintiffs also relied on Catalano's deposition. They contended that the fact that Catalano could have sold more beer but for the cutoff of credit presented a material issue. Additionally, they relied on a subsequent affidavit in which Catalano testified:

Both of my companies have always kept more money in checking accounts than absolutely necessary . . . . When defendants cut off credit, some of this money had to be put into beer inventory. As a result, my companies were less liquid than they were before . . . [T]hey deprived my companies of the opportunity to put that money in time deposits, where it would have drawn interest . . . .

Plaintiffs further controverted the motion with testimony of an expert witness in the field of finance. He stated that a ter-

mination of trade credit has an averse effect on *any* business. "[I]f the company finances the inventories . . . by drawing down its cash reserves, the firm's liquidity and its financial strength are reduced resulting in a decrease in the value of the enterprise." In sum, he was of the opinion that plaintiffs suffered financial injury as a result of the agreement to end credit.

The district court reasoned that because Catalano could not specify how much more beer might have been sold, or how much profit might have been made, he suffered no injury. The court also rejected the claim that an injury can be suffered when surplus cash is utilized to finance inventories even though such use is accompanied by no borrowing or investment of additional cash. The district court erred. It failed to distinguish between the existence of an injury in fact and the means by which the amount of damage can be measured.

■ Plaintiffs' inability to fix the amount of lost profits bears directly on the issue of amount of damages rather than the existence of an injury. Catalano's inability to estimate his damages does not mean that they were not suffered; nor does it bar an antitrust suit. *Bosgosian v. Gulf Oil Corp.,* 393 F.Supp. 1046, 1050 n.7 (E.D.Pa.1975).

The plaintiffs made a sufficient showing of a genuine issue of material fact. The existence of an injury is a material fact sufficiently made a genuine issue by Catalano's claim of lesser sales and the expert witness' testimony that injury did exist.[6] Plaintiffs made an adequate showing of some damage flowing from the agreement, "inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969), *accord Knutson v. Daily Review, Inc.,* 548 F.2d 795, 811 (9th Cir. 1976).

Affirmed in Part, Reversed and Remanded in Part.

BLUMENFELD, District Judge (concurring and dissenting):

I am in agreement with the decision of the majority reversing the lower court's grant of summary judgment against the plaintiffs on the issue of damages; however, contrary to the majority, I would hold that the alleged horizontal agreement among wholesalers to eliminate credit on sales of beer to retailers constitutes a per se violation of the antitrust laws.

It is clear enough by the citation to *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958),[1]

---

**6.** Plaintiffs allege that the defendants have not reduced the price of beer to reflect the termination of free credit. As a result, the measure of damages for plaintiffs' injury, it is argued, should be equal to the cost of financing the beer inventories. Three different methods for determining the amount of damages were suggested by plaintiffs: (1) measure the opportunity cost of any new capital that plaintiffs invested in the business; (2) measure the opportunity cost of borrowing outside funds to finance the inventories; or, (3) measure the reduction in the value of plaintiffs' business occasioned by the financing of inventories out of cash on hand, thereby reducing the liquidity of the business. While not specifically sanctioning any of these methods, difficulty in measuring the amount of damages should not preclude plaintiffs from establishing that injury was suffered.

**1.** "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue

are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves [is] price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129 . . . ."

356 U.S. at 5, 78 S.Ct. at 518.

that the majority does not intend to change the established rule of law in antitrust cases that price fixing is a per se violation. *See also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Although recognizing that price fixing may be accomplished directly or indirectly, the majority finds that the alleged agreement to fix credit terms does not amount to either direct or indirect price fixing. I disagree.

The purchase of goods creates an obligation to pay for them. Credit is one component of the overall price paid for a product. The cost to a retailer of purchasing goods consists of (1) the amount he has to pay to obtain the goods, and (2) the date on which he has to make that payment. If there is a differential between a purchase for cash and one on time, that difference is not interest but part of the price. *See Hogg v. Ruffner*, 66 U.S. (1 Black) 115, 118–19, 17 L.Ed. 38 (1861). Allowing a retailer interest-free short-term credit on beer purchases effectively reduces the price of beer, when compared to a requirement that the retailer pay the same amount immediately in cash; and, conversely, the elimination of free credit is the equivalent of a price increase.[2]

To declare in the instant case that credit is "a 'non-price' condition of sale," as the majority asserts *supra*, is too generalized to be entirely true, and disintegrates when exposed to the economic realities of the beer industry in California. Price competition in the beer industry in California is partially restricted by state law through a system of mandatory territorial restrictions and price posting. *See* Cal.Bus. & Prof. Code §§ 25000 *et seq.* While containers vary in material, and contents vary in taste, calories, and sometimes color, beer of one brand is substantially the same as that of another. It is common for retailers to buy and carry in stock for resale different brands from several distributors concurrently. Given the limits to competition on

price and on product desirability, competition between wholesalers in extending credit takes on greater importance as a method by which wholesalers can effectively lower the price of beer in order to compete for the business of retailers. The majority acknowledges that where "competition with respect to price primarily center[s] on credit terms, . . . an agreement to fix credit terms would amount to price fixing." This was a naked agreement among competitors to fix credit—a restraint which serves no economic purpose other than to affect prices. It affects no other functional element in a sale of beer by a distributor to a retailer. I would therefore hold that the alleged agreement is illegal per se. Nearly 40 years ago the Supreme Court stated:

> "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive.
>
> "  .   .   .
>
> "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*."

*United States v. Socony-Vacuum Oil Co.*, *supra*, 310 U.S. at 221, 223, 60 S.Ct. at 843, 844.

The suggestion in the majority opinion that the per se rule cannot be applied without proof that the purpose of the agreement was to affect prices finds no support

---

**2.** The defendants here do not argue that the purchase price of their beer decreased in pro-

portion to the savings they realized from eliminating free short-term credit.

in the cases. What the purpose of the defendants was, and what they thought about the wisdom of cutting off credit, is irrelevant. The Supreme Court has recently emphasized:

> "In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so 'plainly anticompetitive,' *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50, 97 S.Ct. 2549, 2558, 53 L.Ed.2d 568 (1977), and so often 'lack . . . any redeeming virtue,' *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), that they are *conclusively presumed illegal without further examination under the rule of reason* generally applied in Sherman Act cases."

*Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 7, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979) (emphasis added). Even in the context of criminal liability under the Sherman Act, the Supreme Court has rejected the claim that a criminal conviction requires a finding of a purpose to produce anticompetitive effects. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 444 & n.21, 98 S.Ct. 2864, 57 L.Ed.2d 854; *United States v. Continental Group, Inc.*, 603 F.2d 444 (3d Cir., 1979); Antitrust & Trade Reg.Rep. (BNA), No. 926, E–1, E–9. The agreement among the defendant competitors in the instant case fits comfortably within the classic mode of price fixing, and it is so plainly anticompetitive in its nature and necessary effect that no elaborate study is needed to establish its illegality. *See National Society of Professional Engineers v. United States, supra*, 435 U.S. at 692, 98 S.Ct. 1355.[3]

Paradoxically, our ruling that the plaintiffs' alleged damages would constitute antitrust injury flowing from the withdrawal of credit under the liberal rule for proving damages gives added weight to the foregoing analysis. We hold that plaintiffs have made "an adequate showing of some damage flowing from the agreement" to terminate credit. How to measure the damage is left unresolved; however, it is clear that the damage claim is derived from the increase in the cost of purchasing beer due to the elimination of free short-term credit. To say that the overall cost of purchasing beer increased as a result of the elimination of credit is functionally the same as saying that the effective price of beer rose for these plaintiffs. Since the alleged agreement to fix credit terms raised the effective price of beer, the alleged agreement amounts to price fixing. As such, the per se rule of illegality should govern this case, and the district court's ruling to the contrary should be reversed.

---

**3.** Lest we be led to a false conclusion by the use of ambiguous concepts, it is necessary to point out that the statement of the majority that "an agreement to eliminate credit could sharpen competition with respect to price by removing a barrier perceived by some sellers to market entry," is curiously inappropriate in this case. I am quite unpersuaded by this strange assertion, nor do I subscribe to the suggestion that it would justify an agreement to fix prices. No person seeking entry to the beer distributors' market is a party to this case. Furthermore, how another distributor who would abide by the agreement could add to price competition is difficult to understand since the agreement would "cripple [his] freedom . . . and thereby restrain [his] ability to sell in accordance with [his] own judgment." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951).