Vinod C. BHAN, C.R.N.A., Plaintiff,

v.

NME HOSPITALS, INC., a Delaware corporation d/b/a Manteca Hospital, National Medical Enterprises, Inc., and John E. Menaugh, Defendants.

No. CIV S–83–295 LKK.

United States District Court,
E.D. California.

Sept. 16, 1987.

---

Timothy E. Morgan, McDermott & Trayner, Pasadena, Cal., H.E. Christian Peeples, Oakland, Cal., Michael I. Spiegel, Spiegel, Cutler, Liao & Kagay, San Francisco, Cal., for plaintiff.

Michael C. Normoyle, Teresa Vig Rein, Damrell, Damrell & Nelson, Modesto, Cal., Robert Fabrikant, McKenna, Conner & Cuneo, Washington, D.C., for defendants.

KARLTON, Chief Judge.

Plaintiff Vinod C. Bhan ("Bhan") is a certified registered nurse anesthetist ("CRNA") who, in 1983, lost his job at Manteca Hospital after the Hospital decided to implement a policy which permitted only M.D. anesthesiologists to administer anesthesia at the Hospital. He has sued NME Hospitals, Inc., National Medical Enterprises, Inc., John E. Menaugh ("Menaugh"), California Society of Anesthesiologists ("CSA"), California League of Anesthesiologists ("CLA"), and Dr. Young Suk.[1]

Bhan alleges that the decision of the Hospital to permit only M.D. anesthesiologists to administer anesthesia to patients violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1985). The complaint also alleges a number of pendent state claims. Plaintiff seeks injunctive relief, damages, treble damages, punitive damages, and attorney's fees and costs.

## I

## PROCEDURAL BACKGROUND

Bhan filed his complaint on March 28, 1983, together with an application for Temporary Restraining Order ("TRO"). The proposed TRO sought to compel the Hospital to permit Bhan to perform anesthesia at the Hospital. On April 11, 1983, I denied the application for a TRO because Bhan had failed to satisfy the stringent standards for obtaining mandatory relief.

Defendants CSA and CLA brought a motion to dismiss for failure to state a claim. They argued that plaintiff did not have standing to sue under the federal antitrust laws. I granted the motion because in my view, under California law, nurse anesthetists may not, and thus do not, compete with M.D. anesthesiologists in the same market. Accordingly, I held that the decision by the Hospital to exclude nurse anesthetists did not undermine competition, and thus could not implicate the antitrust laws. I concluded that any injury suffered by Bhan was not the type of injury cognizable under the Sherman Act. The Ninth Circuit reversed in *Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467 (9th Cir.1985), holding that since Bhan could provide anesthesia under a physician's control and direction, it could not be said that, as a matter of law, Bhan was unable to compete with M.D. anesthesiologists.[2]

---

1. Defendants CSA, CLA, and Dr. Young Suk have been dismissed from the case. The only remaining defendants are NME Hospitals, Inc., National Medical Enterprises, Inc., and John E. Menaugh.

2. In my unpublished opinion dismissing this case, I noted that although a nurse may administer anesthesia, a nurse can only do so under the supervision of, inter alia, a physician. *See*

*Magit v. Bd. of Medical Examiners,* 57 Cal.2d 74, 83, 17 Cal.Rptr. 488, 366 P.2d 816 (1961). I found that under such circumstances, by force of California law, anesthesiologists and CRNAs could not compete. I further determined that since California's law arose out of its exercise of its licensing of medical professionals, a matter within the state's police power, it was not preempted. *See Apex Hosiery Co. v. Leader,* 310

Defendants NME Hospitals, Inc., National Medical Enterprises, Inc., and John E. Menaugh have now moved for summary judgment on all of plaintiff's claims. After hearing, the motion was taken under submission. By this order, I grant defendants' motion as to the Sherman Act claims, and dismiss the pendent claims.

## II

## STANDARDS FOR SUMMARY JUDGMENT

In 1986, the Supreme Court addressed the standards for summary judgment in three separate cases: *Matsushita Electric Industrial Co. v. Zenith Radio Corp,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the Court repeatedly denied that it was altering those standards, I know of no district judge who does not believe that in some fashion his or her duty in reviewing such motions has been altered. Below, I articulate my best understanding of the appropriate method of approaching motions for summary judgment. I also note that summary judgment in the antitrust area has taken on a new complexion.

█ As the federal rules provide, summary judgment is appropriate when there exists "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c); *Jung v. FMC Corp.,* 755 F.2d 708, 710 (9th Cir.1985). The moving party bears the initial burden of establishing, through affidavits or otherwise, the absence of a genuine issue as to any material

fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *see T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The moving party does not necessarily have to put on evidence which *negates* the opponent's claim. *Celotex,* 106 S.Ct. at 2553. Rather, the moving party may prevail by simply pointing out "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 2553.

█ When the moving party has identified portions of the record which demonstrate the absence of a genuine issue of material fact, and the opposing party will have the burden of proof as to that fact at trial, the opposing party has an obligation to produce evidence showing that the fact is in dispute. *Celotex,* 106 S.Ct. at 2552–53. If the opposing party fails to make the requisite showing, the court must enter judgment in favor of the moving party. *Id.*

In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex,* 106 S.Ct. at 2553.

█ In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its

U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). I concluded that because CRNAs and M.D.s could not compete, they were not participants in the same market, and, accordingly, plaintiff did not have antitrust standing. *See Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). All the above was, of course, reversed by the Ninth Circuit. Drawing upon the observation that "a product should not be excluded from a market because it requires an additional input in order to be a reasonable

substitute for other products in the market," *Bhan,* 772 F.2d at 1471, the court held that the fact that a CRNA must be supervised by a medical doctor did not preclude CRNAs from participating in the same market as anesthesiologists who, as M.D.s, of course require no supervision. *Id.* I leave to the reader the decision as to whether the issues are analogous. As a district court, I am bound by the circuit's decision, however "misguided." *Brown v. Baden,* 815 F.2d 575, 576 (9th Cir.1987).

pleadings, but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material which support its contention that the dispute exists. *See* Fed.R.Civ.P. 56(e); *Strong v. France,* 474 F.2d 747, 749 (9th Cir.1973).

■ In resolving the summary judgment motion, the court examines "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed.R.Civ.P. 56(c). Of course, it is the obligation of the parties to direct the court to the place in the record where evidence of the facts might be found. All reasonable inferences which may be drawn from the facts before the court must be drawn in favor of the party opposing the motion, in this case plaintiff. *See Matsushita,* 106 S.Ct. at 1356–57. Nevertheless, inferences are not drawn from the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244 (E.D.Cal.1985), *aff'd,* 810 F.2d 898 (9th Cir.1987).

■ I have previously noted a rhetorical reluctance to grant summary judgment in antitrust cases, which I suggested made no difference in the way courts actually resolved such motions. *See Grason Elec. Co. v. Sacramento Mun. Util. Dist.,* 571 F.Supp. 1504, 1507 (E.D.Cal.1983). It is my view that the Supreme Court has completely shifted the premise, and now seeks to encourage the summary disposition of antitrust litigation. Traditionally it has been said that the opposing party must demonstrate that the disputed fact is material, i.e., that it makes a difference in the litigation, and that the dispute is genuine. *T.W. Elec. Service,* 809 F.2d at 630. The opposing party need not establish the material issue of fact conclusively in its favor. *Id.* It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank v.*

*Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

In *Matsushita,* however, the Court explained with respect to a section 1 claim that:

> To survive [the] motion for summary judgment, [plaintiffs] must establish that there is a genuine issue of material fact as to whether [defendants] entered into an illegal conspiracy that caused [plaintiffs] to suffer a cognizable injury.... This showing has two components. First, [plaintiffs] must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct....
>
> Second, the issue must be "genuine." ... When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.

*Matsushita,* 106 S.Ct. at 1355–56 (footnotes and citations omitted). The Court also said that "if the claim is one that simply makes no economic sense[,] [plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 1356.

The Court has also altered the method of handling inferences concerning the existence of a conspiracy. The Court now teaches, at least with respect to parallel conduct cases, that:

> conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.... To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently.... [Plaintiffs] in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiffs].

*Id.* at 1357 (citations omitted).[3]

## III

## UNDISPUTED FACTS

The following facts are not genuinely in dispute:

### A. *Manteca Hospital*

Manteca Hospital is a 49–bed acute care hospital located in Manteca, California, and is owned by NME Hospitals, Inc. A number of individuals and committees contribute to the decision-making process at the Hospital, including an administrator, a Governing Board, an Executive Committee, and a variety of medical staff committees. The granting and review of clinical privileges at Manteca Hospital are governed by the Hospital's bylaws, with ultimate authority over privileges and staff membership resting with the Governing Board.

### B. *The Market for Medical Services*

#### 1. *Hospitals in the Area*

There are a number of hospitals located within 30 miles or 30 minutes of Manteca Hospital, including San Joaquin General Hospital (16 miles/20 minutes), Doctors Medical Center—Modesto (16 miles/22 minutes), Tracy Community Hospital (16 miles/22 minutes), St. Joseph's Hospital—Stockton (16 miles/30 minutes), and Dameron Hospital—Stockton (17.25 miles/35 minutes). In addition, there are other hospitals close to Manteca Hospital, including Memorial Hospital, Modesto City Hospital, and Scenic General Hospital in Modesto; Memorial Hospital South in Ceres; and Oak Valley District Hospital in Oakdale. It is generally accepted in the health industry and uncontested in this case that hospitals within 30 minutes traveling time of each other are in competition with one another.

#### 2. *Health Facilities Planning Area 507*

Manteca Hospital is included along with four other hospitals (Dameron, San Joaquin General, St. Joseph's Hospital—Stockton, and St. Joseph's Oak Park) in a state-designated health planning district called Health Facilities Planning Area ("HFPA") 507. The planning district was established by the California Office of Statewide Health Planning and Development. According to the 1983 annual report, the 49 acute care beds available at Manteca Hospital represented only a 6.3 percent share of the 733 acute care beds that were available in HFPA 507. Forty (40) of the acute care beds at Manteca Hospital were licensed medical/surgical beds. According to the report, those 40 beds represented a 7.3 percent share of the 548 licensed medical/surgical beds available in HFPA 507. In 1983, Manteca accounted for 8,610 patient days for medical/surgical procedures. In 1983, San Joaquin General, St. Joseph's, and Dameron had a combined total of 465 medical/surgical beds available, and accounted for a total of 118,045 patient days for medical/surgical services. Anesthesia is largely administered in conjunction with medical/surgical services.

#### 3. *Patients Who Live Near Manteca Hospital*

Many of the patients who live in close proximity to Manteca Hospital elect to go to hospitals other than Manteca when in need of medical services. In 1983, 78.2 percent of the total admissions at Manteca Hospital came from the geographic area represented by ZIP code area 95336. Yet nearly 60 percent (58.2%) of patients who lived in that area used hospitals other than Manteca Hospital. An expert reported that some of the patients from the ZIP code area may have gone to other hospitals because the procedures they wanted were not available at Manteca Hospital. None-

---

**3.** The approach taken by the Supreme Court seems to distinguish the handling of inferences in antitrust cases from all others. Such a distinction cannot be justified since a single federal rule governs all summary judgment. It may be, however, that the Court is inartfully making the point that where defendants have legitimate business reasons for the conduct complained of, proof of the conduct, vel non, even if parallel, is insufficient to provide a factual premise for an inference of unlawful conduct. *See Nielsen Freight Lines,* 602 F.Supp. at 1244–45.

theless, a 1980 patient origin study conducted under the auspices of the North San Joaquin Valley Health Systems shows that more than 50 percent of the patients from that area chose to have procedures performed at hospitals other than Manteca, even though the same procedures were available at Manteca.

### C. *The Distribution of Surgeons in the Area*

Most, if not all, physicians who have staff privileges at Manteca Hospital also have privileges at other hospitals in the area. Between 1979 and 1983, nearly all doctors who maintained medical staff privileges at Manteca Hospital, including "close to 100%" of the surgeons at the Hospital, had staff privileges at nearby hospitals in Stockton and Modesto. Many of the doctors who work at Manteca Hospital arrange for "coverage" by doctors based outside of Manteca, most commonly in Tracy, Stockton or Modesto.

### D. *The Distribution of Anesthesia Providers*

Some hospitals in the area do not use CRNAs to provide anesthesia services. However, at least one hospital (San Joaquin General), and possibly two others (Modesto City and Oakdale), in the area utilizes the services of CRNAs. In addition, physicians who provide surgery on an outpatient basis in their offices use nurse anesthetists. There is no evidence to suggest the distribution of M.D. anesthesiologists in the area, or the ratio between nurse anesthetists and M.D. anesthesiologists.

### E. *The AAS Contract With the Hospital*

AAS was a business entity which provided hospitals with anesthesia services, including billing, the coordination of anesthesia schedules and coverage, and the supplying of anesthesia providers. Sometime in the Fall of 1979, Manteca Hospital entered into an oral contract with AAS, whereby AAS agreed to provide anesthesia services at the Hospital. Under the contract, AAS supplied the Hospital with nurse anesthetists and M.D. anesthesiologists, and was responsible for all billing and collection activity. Manteca Hospital had no involvement in billing the anesthesia services provided under the AAS contract. On April 1, 1981, Manteca and AAS entered into a written contract for the provision of anesthesia services. Pursuant to the 1981 written agreement, AAS was to continue supplying the Hospital with both M.D. anesthesiologists and nurse anesthetists.

### F. *Bhan's Employment at Manteca Hospital*

Plaintiff Bhan is a CRNA who moved to California in 1979. Before he started working at Manteca Hospital, he worked as a nurse anesthetist at a number of other hospitals in the Central Valley. In the Spring of 1979, Bhan responded to an advertisement placed by AAS soliciting the services of nurse anesthetists and M.D. anesthesiologists, and was referred by AAS to Manteca Hospital. Plaintiff began his work at the Hospital as a nurse anesthetist in either August or September of that year. In December 1979, Bhan entered into a written contract with AAS to provide anesthesia coverage for AAS clients. The contract provided that AAS would pay Bhan a guaranteed monthly retainer of $2,500.

Bhan worked primarily at Manteca Hospital from 1979 to 1983. However, he also worked during those years at other hospitals in Sanger, Reedley, Dinuba, Dos Palos, Patterson, Oakdale, Vallejo, and Antioch, and at family planning clinics operated by Family Planning Associates Medical Group. Bhan's position at Manteca Hospital was terminated when the AAS contract expired in March 1983. During the period of time he had provided anesthesia services at the Hospital, Bhan performed competently.

### G. *The Decision Not to Renew the AAS Contract*

Before the AAS contract expired on March 31, 1983, the Hospital had decided not to renew it. In its place, the Hospital instituted a policy which permitted only M.D. anesthesiologists to provide anesthesia services at the Hospital, thereby exclud-

ing nurse anesthetists. The parties disagree about why the Hospital made that decision. Nonetheless, there appear to be a number of facts that are not substantially in dispute.

In meeting its contractual obligation to furnish anesthesia services between 1979 and 1983, AAS referred to the Hospital both M.D. anesthesiologists and Bhan, the nurse anesthetist. A number of surgeons and administrators felt that the services provided by AAS were not satisfactory. There was frequent turnover of the M.D. anesthesiologists supplied by AAS. Often there would be a different M.D. anesthesiologist each week, and sometimes each day. Sometimes there would be no M.D. anesthesiologist, and the nurse anesthetist would provide all the anesthesia services. Few of the M.D. anesthesiologists stayed at the Hospital longer than a month or two.

Another problem perceived by the surgeons was the lack of 24–hour coverage by M.D. anesthesiologists. Surgeons were concerned that where an M.D. anesthesiologist was not available for a particular surgery, the surgeon would be held legally accountable for the actions of the nurse anesthetist. This belief was founded in part on the fact that the surgeon had to "sign-off" on the anesthesia record of the nurse anesthetist after the completion of surgery. *See* n. 2, *supra.* Some surgeons also believed that a nurse anesthetist was not competent to perform anesthesia in certain cases.

The Hospital decided that it had to take steps to reduce the turnover problems and to ensure 24–hour coverage by an M.D. anesthesiologist. Menaugh discussed possible alternatives with several M.D. anesthesiologists in the area. In this regard, Menaugh had extensive discussions with Dr. Edward Kimm, an M.D. anesthesiologist who worked in Modesto. In May 1982, Dr. Kim introduced Dr. Young Suk, another M.D. anesthesiologist, to Menaugh, and Menaugh interviewed Dr. Suk for a position as an anesthesiologist at the Hospital. The negotiations broke down, and Dr. Young Suk subsequently went to work

for Dr. Edward Kimm at Doctors Medical Center.

In June 1982, Menaugh met with Mr. Buznic, an official with AAS, to discuss the provision of anesthesia services under the AAS contract. At that meeting, Menaugh and Buznic discussed whether AAS could provide 24–hour coverage by an M.D. anesthesiologist. Buznic rejected the suggestion that AAS supply a second M.D. anesthesiologist because he felt that the volume of work at the Hospital would not support a third anesthesia provider. Instead, Buznic suggested that the Hospital replace the M.D. anesthesiologist who was working there at that time with another M.D. anesthesiologist, Dr. Michael Cull. In August 1982, Dr. Cull entered into a contract with AAS to provide anesthesia services to clients of AAS, and the Hospital granted provisional staff privileges to Dr. Cull the following month.

In January 1983, Menaugh reported to the Governing Board that he had decided that the AAS contract should not be renewed. Sometime after that decision, Bhan was informed that his employment at the Hospital would end upon the expiration of the contract. In addition, Menaugh informed Dr. Cull that, because he was an employee of AAS, Dr. Cull would not be permitted to work at the Hospital after the AAS contract expired. Shortly thereafter, Dr. Cull retained an attorney to challenge the Hospital's right to terminate his privileges at the Hospital. Menaugh reconsidered his decision to terminate staff privileges of Dr. Cull, and decided that Dr. Cull could continue to work at the Hospital after the expiration of the AAS contract.

At about the same time Menaugh decided that the AAS contract should not be renewed after its expiration, he learned that Dr. Young Suk had left Dr. Kimm's group in Modesto, and was interested in discussing the possibility of working at Manteca. In February 1983, the Hospital extended an invitation to Dr. Suk to work at the Hospital. Dr. Suk accepted the invitation.

On February 24, 1983, the Surgery Committee met to consider the alternatives available to the Hospital after the AAS

contract expired, and to formulate their recommendation for the Hospital's Medical Staff Executive Committee. Bhan and Dr. Cull attended the meeting. The Surgery Committee minutes of that meeting show that the following concerns were raised: the surgeons were afraid that they would be held legally accountable for the actions of the nurse anesthetists; surgeons did not feel they could interrupt a surgery to supervise a nurse anesthetist and, in any event, did not feel qualified to intervene; the surgeons believed that only M.D. anesthesiologists receive the training necessary to handle the range of possible complications during anesthesia; and, it was not practical to have an M.D. anesthesiologist supervise nurse anesthetists at all times.

After hearing comments from Bhan and Dr. Cull, the Surgery Committee decided to recommend that the Hospital adopt a policy restricting the provision of anesthesia services to M.D. anesthesiologists. There is no direct evidence that the surgeons discussed the economic benefits that would be enjoyed by the M.D. anesthesiologists by virtue of this decision.[4] No M.D. anesthesiologist participated in the decision to recommend an M.D. anesthesiologist-only policy.

The recommendation of the Surgery Committee was forwarded to the Manteca Hospital Executive Committee. The Executive Committee met on March 1, 1983, to discuss the recommendation. Bhan attended the Executive Committee meeting, but there is no indication that Dr. Cull attended the meeting. After consideration of the various issues raised by the Surgery Committee, the Executive Committee accepted the recommendation to adopt a policy of permitting only M.D. anesthesiologists to administer anesthesia at the Hospital. No M.D. anesthesiologists participated in the decision to accept the Surgery Committee's recommendation.

At a monthly meeting on March 22, 1983, the Governing Board took up the Executive Committee's proposal. After considering the various aspects of the recommendation, and hearing comment from Bhan, the Board adopted the policy recommended by the Surgery Committee and the Executive Committee. There were no M.D. anesthesiologists present at the Governing Board meeting.

### H. *The Effect Of The Decision On Bhan's Livelihood*

Menaugh notified Bhan by letter of March 29, 1983, that due to the decision of the Governing Board, Bhan would no longer be permitted to work at the Hospital after March 31, 1983. After the termination of his relationship with Manteca Hospital, Bhan immediately began to look for other employment arrangements. In early April 1983, Bhan signed an agreement with Worldwide Anesthesia Associates ("Worldwide") whereby Worldwide agreed to pay $2,800 a month for each month that Bhan worked for Worldwide. Bhan decided not to go forward with that contract because he felt that it would cause his family hardship.

Bhan eventually went to work at other hospitals and clinics. He testified that as a result of his new working arrangements, he had to travel extensively, his wife had to return to work, he was away from home more, his children did not do as well in school, and he lost his friends at Manteca Hospital. Sometimes Bhan was away from home three weeks a month. Bhan testified that his reputation was damaged because he was not able to work with people he used to work with, and that he does not know what the people at Manteca Hospital think about him.

Although Bhan feels that he "lost what [he] had" at Manteca Hospital, there is no evidence showing the extent of monetary damage Bhan suffered as a result of his termination. In fact, Bhan's tax records show that his gross income has dramatically increased since he left the Hospital. According to his tax records, Bhan received in gross income the following amounts be-

---

4. Plaintiff provided the court with an incomplete transcript of a purported tape recording of the meeting. The transcript is composed of fragments of conversation and, as a result, is virtually indecipherable. Accordingly, I give it no weight here.

tween 1979 and 1985: 1979—$15,862; 1980—$40,640; 1981—$48,090; 1982—$48,238; 1983—$53,340; 1984—$68,356; and 1985—$96,074. Bhan testified that he expected to make at least $95,074 during 1986, and that he would probably make more. Bhan has produced no records showing what portion of his gross income from 1979 to 1983 came from his employment at Manteca Hospital. However, Bhan has stated that approximately 80% of his income during those years was derived from the services he rendered at Manteca Hospital.

### I. *The Division of Anesthesia Services After The Decision*

After the decision of the Governing Board, Dr. Young Suk joined Dr. Cull as the second M.D. anesthesiologist. After some initial disagreement, Dr. Cull and Dr. Suk agreed to divide the work equally between them. Under the agreement, each would work four days a week and each was responsible for alternate weekends.

### J. *The Effect Of The Decision On Anesthesia Rates and Services*

During the period of time the AAS contract was in effect, AAS set the rates to be charged for anesthesia services. The rates set by AAS for the services of M.D. anesthesiologists were generally higher than the rates charged for the services of M.D. anesthesiologists at other hospitals in the area. There were some bills that charged out at a rate of $38 a unit when other hospitals in the area were charging a high of $34 a unit. Moreover, the only evidence before the court shows that, at least in some cases, the rates billed out for Bhan and Dr. Cull were equivalent. Bhan has testified he has no evidence that the rate which AAS charged for his work was ever lower than the rate charged for the services of an M.D. anesthesiologist. In fact, Bhan does not know what AAS was billing

out for his services. After the expiration of the AAS contract, the cost of anesthesia services at Manteca Hospital dropped.

## IV

## JURISDICTION

The Sherman Act prohibits conspiracies "in restraint of trade or commerce among the several states," 15 U.S.C. § 1, and also prohibits monopolizing "any part of the trade or commerce among the several states." 15 U.S.C. § 2.[5] It has been said that the Act "defines both the conduct proscribed by the statute and its jurisdictional reach." *Western Waste Service Systems v. Universal Waste Control,* 616 F.2d 1094, 1096 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980). The jurisdictional reach of the Sherman Act is broad, and generally coextensive with Congressional authority under the Commerce Clause. *See McLain v. Real Estate Bd.,* 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980). Accordingly, a plaintiff may establish federal jurisdiction under the Act upon a showing that "defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." *Id.* at 242, 100 S.Ct. at 509.

A number of circuits have held that it is the unlawful conduct itself that must occur in or affect interstate commerce. *See, e.g., Stone v. William Beaumont Hospital,* 782 F.2d 609, 614 (6th Cir.1986); *Seglin v. Esau,* 769 F.2d 1274 (7th Cir.1985). This interpretation would appear to be consistent with the language of the statute. In *McLain,* however, the Supreme Court indicated that it is the general business activities of a defendant, and not the challenged conduct, that is the focus of the jurisdictional inquiry. *McLain,* 444 U.S. at 242–

---

**5.** Section 1 provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

Section 2 provides in relevant part that "[e]very person who shall monopolize, or at-

tempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."

43, 100 S.Ct. at 509. The Court reasoned that:

> If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect.

*Id.* at 243, 100 S.Ct. at 509.

■ Relying upon *McLain*, the Ninth Circuit has held that to establish jurisdiction it is "not necessary for the alleged antitrust violations complained of to have affected interstate commerce as long as defendants' business activities, independent of the violations, affected interstate commerce." *Western Waste Service*, 616 F.2d at 1097. Irrespective of the positions taken by the other circuits, I am, of course, bound by the Ninth Circuit's view. Accordingly, to establish jurisdiction in the Ninth Circuit, Bhan need only show that the Hospital's general business activities are "in commerce." *See also Hahn v. Oregon Physicians Service*, 689 F.2d 840, 844 (9th Cir.1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983).

■ The plaintiff alleges in his complaint both that the general business activities of the Hospital are in interstate commerce and that they affect interstate commerce. In particular, plaintiff alleges that the chemicals, equipment, and supplies used to provide anesthesia services at the Hospital were purchased and shipped in interstate commerce. In addition, plaintiff alleges that a substantial portion of the cost for anesthesia services is paid for by Medicare and by "nation-wide and inter-state" insurance carriers. Finally, defendants NME Hospitals, Inc. and National Medical Enterprises, Inc. are out-of-state corporations.

Defendants take the position that alleged unlawful conduct must be in or affect commerce, and, as a result, do not produce any evidence which suggests that either the Hospital's business activities in general, or the anesthesia services in particular, are *not* in commerce. Because defendants have failed to produce evidence which shows that their general activities are not in interstate commerce, the question is resolved by examination of the pleadings. *See Thornhill Publishing Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir.1979). I conclude that plaintiff has sufficiently alleged a jurisdictional basis for this action.

## V

### THE 15 U.S.C. SECTION 15(a) CLAIM

Section 4 of the Clayton Act, 15 U.S.C. § 15(a), grants a right of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." The injured party may sue to "recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." *Id.*

The language of section 15(a) is as straightforward as it is broad. Taken literally, it would encompass any injury to a person's business or property caused by an antitrust violation. Based on the terms of the statute, a plaintiff would need to prove only two things to prevail on a section 15(a) claim: (1) that he was injured in his business or property; and (2) that the injury was the result of an antitrust violation. I have previously traced the courts' rude treatment of the statute's language, and the narrowing of liability through development of the notion of "antitrust standing." *See Sacramento Valley Chapter of the Nat'l Elec. Contractors Ass'n (NECA) v. Int'l Bhd. of Elec. Contractors (IBEW)*, 632 F.Supp. at 1403, 1406–10 (E.D.Cal. 1986).[6] As noted in *NECA*, at 1407 n. 5, "antitrust standing" is not to be confused with constitutional standing. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of

---

6. Obviously, a person may suffer harm unrelated to his or her business or property. The Supreme Court thus overstated the case when it declared that a literal interpretation of the statute would "encompass *every* harm" attributable to an antitrust violation. *See Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 529, 103 S.Ct. 897, 904, 74 L.Ed.2d 723 (1983) (emphasis added).

injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors v. California State Council of Carpenters ("AGC"),* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723.

Presumably to avoid the inevitable confusion between "antitrust standing" and "constitutional standing," the Ninth Circuit has abandoned the "antitrust standing" label and has, instead, simply characterized the issue as being whether a given plaintiff is a proper party to bring an antitrust action against a defendant. *See Lucas v. Bechtel Corp.,* 800 F.2d 839, 843 & n. 6 (9th Cir.1986); *Bhan,* 772 F.2d at 1469–70 n. 2 (9th Cir.1985).[7] However characterized, the question of whether a plaintiff can sue under the antitrust laws is a preliminary issue that must be resolved before the substantive elements of an antitrust claim can be addressed.

### A. *Antitrust Standing/Proper Party Determination*

■ Because the Supreme Court has sought to apply common law notions of duty to the issue of antitrust standing, no bright line rule can provide a clear answer in every case as to whether a particular party may sue. *See NECA,* 632 F.Supp. at 1409. "Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *AGC,* 459 U.S. at 536–37, 103 S.Ct. at 908. Those factors include: (1) the nature of the plaintiff's injury, (2) the directness of the injury, (3) the speculative nature of the harm, and (4) avoiding

the risk of duplicative recoveries on the one hand, or the danger of complex apportionment of damages on the other. *AGC,* 459 U.S. at 538–44, 103 S.Ct. at 908–911; *Lucas,* 800 F.2d at 844. The foregoing list of factors is non-exclusive, and the Supreme Court has not said that a plaintiff must "satisfy all of the ... factors or, indeed, any particular factor." *Bhan,* 772 F.2d at 1470 n. 3.

### 1. *Nature of the Injury*

■ The Sherman Act was enacted to assure competition in the marketplace by "protecting the economic freedom of participants in the relevant market," *AGC,* 459 U.S. at 538, 103 S.Ct. 908, and is thus said to protect only against injury sustained as a result of anticompetitive activities. *See id; Lucas,* 800 F.2d at 844. Accordingly, only a plaintiff who has suffered an antitrust injury, i.e., an injury of the type that antitrust laws were intended to protect against, may sue. *Lucas,* 800 F.2d at 844.

■ There are evidently two aspects to ascertaining whether a plaintiff has suffered an antitrust injury.[8] First, the injured party must "participa[te] in the same market as the alleged malefactors," either as a competitor or a consumer. *Lucas,* 800 F.2d at 844. The Ninth Circuit has already ruled that Bhan was a participant in the same market as M.D. anesthesiologists, and thus he has satisfied this aspect of the test. This holding is, of course, the law of the case and, accordingly, I need not further address that issue here.

■ The second issue is whether plaintiff has suffered injury in his business

---

**7.** I have expressed my opinion that since "[a]ntitrust violations are essentially tortious acts," and that "[a]n element of any action in tort is an allegation that the defendant owed a duty to the plaintiff," it is unclear why "questions of the existence of duty in antitrust cases have been denominated questions of 'antitrust standing,' rather than simply questions of duty." *NECA,* 632 F.Supp. at 1407 (footnote omitted).

**8.** The means chosen by the Supreme Court to distinguish persons who may sue from those who may not "has not been a particularly successful technique for providing guidance to the lower courts who must apply the law on a

day-to-day basis." *NECA,* 632 F.Supp. at 1409 n. 13. In like manner, because the line of demarcation between the issue of standing and the merits is, to say the least, imprecise, it is not altogether clear what aspects of causation are to be resolved at the preliminary stage and what aspects are to be resolved at trial. *Compare Lucas,* 800 F.2d at 844 (causation a standing problem), *with William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1051 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) (causation a merits question).

or property. *See* 15 U.S.C. § 15(a). The term "business" as used in the statute refers to "that which occupies the time, attention and labor of [persons] for the purpose of ... pecuniary reward." *Fine v. Barry and Enright Productions*, 731 F.2d 1394, 1397 (9th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984). The word " 'property' comprehends anything of material value owned or possessed," including money. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). The property need not be related to a business, and a business need not be related to property. *See id.* at 339, 99 S.Ct. at 2331. Personal injuries are not compensable under the Sherman Act. *Id.*

 There can be no doubt that Bhan's work at the Hospital was a business for antitrust purposes, and that the decision of the Hospital to permit only M.D. anesthesiologists to provide anesthesia services at the Hospital caused injury to that business. In fact, the decision of the Hospital destroyed the business. Given the Ninth Circuit's determination that M.D. anesthesiologists and CRNAs participate in the same market, Bhan's loss of his business is exactly the kind of injury that the antitrust laws were designed to forestall.

 Bhan also suffered a number of injuries unrelated to his business or property. As a result of the termination, Bhan alleges that his wife had to get a job and the school work of his children deteriorated. These injuries, if compensable, are suffered by Bhan's wife and children, and Bhan has no standing in the constitutional sense to bring an action for those events. He also alleges that he lost his friends at the Hospital, and that his reputation at the Hospital was marred. These are personal injuries that are simply not compensable under the antitrust laws. Bhan may not sue to recover for losses unrelated to his business or property under the Sherman Act.

### 2. Directness of the Injury

A second factor to be considered in evaluating whether a plaintiff enjoys antitrust standing is whether the injury claimed is direct or indirect. *AGC*, 459 U.S. at 540, 103 S.Ct. at 909. Although the inquiry into whether an injury is direct or indirect is largely "unquantifiable," this factor can be "most easily measured by the presence of others more immediately harmed who could bring the action." *NECA*, 632 F.Supp. at 1409[9]. Accordingly, the court must take into consideration whether there is a more immediate victim of the illegal conduct. *See AGC*, 459 U.S. at 541–42, 103 S.Ct. at 910.

 The injuries suffered by competitors as the result of anticompetitive conduct are generally considered direct, since they tend to flow immediately from the unlawful conduct and not from the injuries sustained by someone else. *See Lucas*, 800 F.2d at 844–45. The Ninth Circuit has already determined that, as a nurse anesthetist, Bhan is in competition with M.D. anesthesiologists. While it may be argued that consumers are as directly harmed as competitors by anticompetitive activity, competitors are, of course, within the class of those who may bring an antitrust action. *See id.* I conclude that Bhan's injuries are a direct result of the alleged unlawful conduct.

### 3. Speculative Nature of the Damages

 Section 15(a) authorizes persons who have been injured to bring suit. The statute does not make the existence of *damages* a prerequisite to bringing an action. Nonetheless, a third factor to consider in determining whether a plaintiff can bring suit is whether the damages allegedly sustained by plaintiff are speculative. *See AGC*, 459 U.S. at 542, 103 S.Ct. at 911; *cf. Lucas*, 800 F.2d at 844 (question is

9. The word "direct" has been defined as "proceeding from one point to another in time or space without deviation or interruption." Webster's Third New Int'l Dictionary 640 (1976).

The word "indirect" has been defined as "not direct; ... deviating from a direct line or course: not proceeding straight from one point to another." *Id.* at 1151.

whether measure of "harm" is speculative).[10]

■ Antitrust damages may be speculative in one of two ways. First, the existence or fact of damages may be speculative. The existence of damages is speculative when there is a serious question as to whether a plaintiff suffered any monetary loss as the result of the unlawful conduct. Second, the amount of damages may be speculative. The amount of damages is speculative when, although it is clear that a plaintiff suffered some loss, plaintiff is unable to provide any measure of the extent of his loss.[11] *See Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969); *Ronwin v. State Bar,* 686 F.2d 692, 700 (9th Cir.1981); *Catalano, Inc. v. Target Sales, Inc.,* 605 F.2d 1097, 1102 (9th Cir.1979).

■ In proving that he is a proper party to bring the action, the plaintiff need only show that the existence or fact of damage is not speculative, i.e., that he has suffered some damage. *See Catalano,* 686 F.2d at 1102. The plaintiff need not prove the extent of his damages. *Id.* As the Supreme Court explained in *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), "[t]he rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." *Accord William Inglis,* 668 F.2d at 1051. So long as the plaintiff shows that he has suffered some actual damage, the plaintiff can bring suit and is entitled to nominal damages, even if the amount of damages is not ascertainable. *See Catlin v. Washington Energy Co.,* 791 F.2d 1343, 1350 (9th Cir.1986); *First Beverages, Inc. v. Royal Crown Cola Co.,* 612 F.2d 1164, 1176 (9th Cir.), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

Bhan has demonstrated without a doubt that he suffered actual damages as a result of the alleged conspiracy of the defendants. The conduct in issue destroyed Bhan's business at Manteca Hospital, causing him to lose all that he would have made at the Hospital absent the decision to prohibit nurse anesthetists from providing anesthesia. The fact that Bhan was able to mitigate his damages by successfully creating another business does not negate the fact that he sustained damages. Indeed, the principle of mitigation of damages presumes that there are damages to mitigate. To provide an antitrust violator immunity from suit simply because the victim successfully mitigates his damages would undermine the antitrust laws' broad goal of restraining anticompetitive conduct.

### 4. Complexity of the Litigation

The Court explained in *AGC* that there is an interest "in keeping the scope of complex antitrust trials within judicially manageable limits." 459 U.S. at 543, 103 S.Ct. at 911. A final consideration, therefore, is whether by permitting a particular plaintiff to bring an action under the antitrust laws, the court is running "the risk of duplicate recoveries on the one hand, or ... of complex apportionment of damages on the other." *Id.* at 543–44, 103 S.Ct. at 911.

Despite appearances, this is not a complex case, and it appears that only Bhan and those consumers who would have pre-

---

**10.** The Supreme Court decision in *AGC* tends to blur the distinction between injury and damage. A person is "injured" when a legally protected interest is invaded by another. *See* Restatement (Second) of Torts § 7 (1965). "Damages" refers to the monetary compensation recoverable by a person who has been injured, that is, the "sum of money awarded to a person injured by the tort of another." Restatement (Second) of Torts § 12A (1965). It is true, of course, that treble damages are not recoverable under the Clayton Act unless actual damages are ascertainable, *see* 15 U.S.C. § 15(a), but this is not the same thing as saying that a person cannot sue unless he has suffered ascertainable damages.

**11.** Defendants contend that Bhan has not suffered injury because he made substantially more money after he left Manteca Hospital, and in fact has conceded that he has no evidence that he suffered any monetary damage as a result of the destruction of his business. This argument does not challenge the existence of injury, but only the extent of damage. *See supra* at section VA1.

ferred using his services at Manteca Hospital have been injured by the actions of defendants. Consequently, there is not much chance that permitting Bhan to sue runs the risk of duplicate recoveries or complex apportionment of damages.

■ I conclude that, given the law of the case, the nature and directness of plaintiff's injury, the nature of the damages, and the complexity of the case, Bhan has the right to sue under the antitrust laws.

## B. *Substantive Antitrust Violations*

Having determined that Bhan may bring this action, the next question is whether the injuries to Bhan were caused by defendants' violations of the antitrust laws. Bhan has alleged that defendants' conduct violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. I begin with his section 1 claim.

### 1. *Section 1 Violation* ·

To prevail on a section 1 claim, Bhan must show (1) that there was a contract, combination, or conspiracy; (2) that the contract, combination, or conspiracy unreasonably restrained trade or commerce; and (3) that the restraint affected interstate commerce. *See* 15 U.S.C. § 1; *T.W. Elec. Service*, 809 F.2d at 632–33. I have already concluded that the Hospital's activities affect interstate commerce.[12] Accordingly, I now address whether defendants contracted, combined, or conspired together and, if so, whether that joint conduct caused a restraint of trade.

#### a. *Contract, Combination, or Conspiracy*

■ A "contract, combination, or conspiracy" under the antitrust laws may

be defined as concerted action intended to achieve a common goal. *See T.W. Elec. Service*, 809 F.2d at 632–33. To establish a conspiracy, a plaintiff must present "direct or circumstantial evidence that reasonably tends to prove that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Wilcox v. First Interstate Bank*, 815 F.2d 522, 525 (9th Cir.1987) (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)). Although a conspiracy cannot be inferred from parallel conduct absent an inquiry into the motivation of the alleged conspirators, proof of motivation is not required when there exists either direct evidence of collaboration or other probative circumstantial evidence (beyond evidence of mere parallel conduct) from which to infer an agreement. *See Wilson Indus., Inc. v. Chronicle Broadcasting Co.*, 794 F.2d 1359, 1365 (9th Cir.1986); VI P. Areeda, *Antitrust Law* ¶¶ 1412a, 1425b.[13] In establishing that defendants acted jointly to achieve a common goal, plaintiffs must of course identify who the alleged conspirators are and what the alleged conspiracy was to accomplish. *See T.W. Elec. Service*, 809 F.2d at 633.

Bhan claims that the two M.D. anesthesiologists (Dr. Suk and Dr. Cull) and the Hospital Administrator (John Menaugh) conspired with members of the Surgery Committee (Drs. Stoops, Lin, Williams, Espiritu, and Barr) and others to protect the income of the two M.D. anesthesiologists by pressuring the Hospital to adopt a policy permitting only M.D. anesthesiologists

---

**12.** As noted in section IV, *supra,* the jurisdictional inquiry is coextensive with the substantive requirements of the Sherman Act.

**13.** Motivation plays a multifaceted role in proving an antitrust violation. In addition to forming a basis for inferring a conspiracy when presented in the context of parallel conduct, motive may also be relevant in showing that conduct unreasonably restrained trade. *See, e.g., Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.,* 710 F.2d 1366, 1372 (9th Cir. 1983) (acting with anticompetitive purpose may

suffice to permit presumption of anticompetitive effect under "per se" analysis); *Betaseed, Inc. v. U and I, Inc.,* 681 F.2d 1203, 1228 (9th Cir.1982) (for "rule of reason" purposes court is to examine intent of defendants as well as anticompetitive effect). Some authorities have criticized any inquiry into the state of mind of a defendant to prove a restraint of trade because, in their view, the actual intention of a defendant seldom determines whether a particular restraint is unreasonable. *See, e.g.,* VII P. Areeda, *Antitrust Law* ¶ 1506, at 389 (1986).

to provide anesthesia services at the Hospital. This policy resulted in the exclusion of all CRNAs, including Bhan, from practice at the Hospital.

 I begin by noting that this is not a "parallel conduct" case. On the contrary, the defendants freely acknowledge that the action which forms the gravamen of the suit was the result of a series of decisions made after consultations and deliberation. The only question is whether there is evidence sufficient to infer wrongful conduct. Under the evidence before the court, I cannot say that a jury could not reasonably infer that defendants Menaugh and the Hospital, through the Governing Board, acted in concert with others toward a common goal, that is to replace CRNAs with M.D. anesthesiologists. Menaugh actively participated at every stage of the decision-making process which ultimately resulted in the exclusion of the CRNAs. He had a number of discussions with the two M.D. anesthesiologists at the Hospital and with the surgeons, alleged co-conspirators, about anesthesia services at the Hospital. In January 1983, Menaugh reported to the Governing Board that the AAS contract should not be renewed, and ultimately made the decision to terminate Bhan's employment at the Hospital upon expiration of the contract. He attended the Surgery Committee meeting of February 1983, during which members of the Committee, other alleged co-conspirators, discussed the basis for the decision to adopt an M.D. anesthesiologist-only policy. Menaugh actively discussed the basis for the policy during both the Executive Committee meeting and the meeting of the Governing Board. The Governing Board made the ultimate decision to exclude CRNAs. The evidence taken together raises a genuine issue of fact as to whether defendants acted in concert to exclude nurse anesthetists from the Hospital.

Defendants argue that even if they collaborated to exclude CRNAs, the joint action does not constitute an antitrust conspiracy. They assert the evidence demonstrates that they were all acting on behalf of the Hospital, and that independent, unilateral action by a single entity does not qualify as concerted action. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). I turn to the substantive law under which defendants' assertion must be resolved.

 A company "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Id.* It has been held that "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984); *accord Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 455 n. 7 (9th Cir.1979). This is because employees and "officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Copperweld Corp.*, 467 U.S. at 769, 104 S.Ct. at 2740.

Conversely, officers or employees acting on their own behalf may be subject to liability for an antitrust conspiracy. *Id.* at 769–70 n. 15, 104 S.Ct. at 2741 n. 15; *Motive Parts Warehouse v. Facet Enterprises*, 774 F.2d 380, 387 (10th Cir.1985) (employees capable of conspiracy with corporate employer where they have an independent personal stake). The central question is whether the ultimate interests of the firm and the alleged co-conspirators are identical. *See id.* at 772 n. 18, 104 S.Ct. at 2742 n. 18. The question of whether the defendants were capable of an antitrust conspiracy is a question of fact. *Zidell Explorations, Inc. v. Conval Int'l, Ltd.*, 719 F.2d 1465, 1468 (9th Cir.1983). If a reasonable inference can be drawn that the alleged conspirators were *not* acting as a single economic entity, summary judgment is precluded. *See id.*

 In the matter at bar, at least some participants in the alleged conspiracy may have had economic interests that were different from the interests of the Hospital. The M.D. anesthesiologists and surgeons

were not employees or officers of the Hospital but rather independent contractors. As such, the evidence suggests that they may have had an independent personal stake in any decision by the Hospital. *Cf. Weiss v. York Hospital*, 745 F.2d 786, 815 (3d Cir.1984) (each medical staff member of Hospital has distinct economic interest). Accordingly, there is a disputed issue of material fact as to whether the alleged combination to exclude CRNAs was an independent, unilateral decision by the Hospital.[14] Under the circumstances, I cannot grant the motion for summary judgment on the ground that there was no contract, combination, or conspiracy.

### b. *Restraint of Trade*

Although section 1 provides that every conspiracy in restraint of trade violates the law, it has long been settled that the term "every" as used in section 1 refers only to those agreements which "unreasonably" restrain trade. *See Standard Oil Co. v. United States*, 221 U.S. 1, 58–60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911); *O.S.C. Corp. v. Apple Computer Co.*, 792 F.2d 1464, 1467 (9th Cir.1986). Depending on the nature of the claim, there are two modes of legal analysis for determining whether an agreement "unreasonably" restrains trade—the per se rule and the rule of reason. *T.W. Elec. Service*, 809 F.2d at 633. Bhan argues that defendants' alleged conspiracy to exclude CRNAs was an unreasonable restraint of trade under either analysis.

### (1) *Per Se Analysis*

Through the course of antitrust litigation, the courts have found that some restraints are so consistently contrary to the principles of a free market economy, and so plainly without redeeming economic virtue, that they are illegal per se, i.e., they "are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have

caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Supreme Court and the Ninth Circuit have applied the per se rule to four different kinds of agreements: horizontal and vertical price fixing, horizontal market division, group boycotts or concerted refusals to deal, and tying arrangements. *See Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.*, 710 F.2d 1366, 1370 (9th Cir.1983). These agreements are presumptively illegal because they are typically "naked restraints of trade with no purpose except stifling of competition." *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963).

At first blush, the arrangement at issue here would appear to be akin to a group boycott or a concerted refusal to deal. Nonetheless, the reasoning of the Supreme Court in *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), suggests that the policy of the Hospital of excluding nurse anesthetists from performing anesthesia during the course of surgery is more appropriately analyzed as a tie-in (or tying) agreement. A "tie-in" is established when a seller refuses to sell one product (the tying product) unless the buyer also purchases another (the tied product). In *Jefferson Parish Hospital*, the court found that the hospital requirement that the users of the hospital's operating room purchase the hospital's chosen anesthesia service constituted a tying arrangement. Similarly, in this case, the Hospital's policy compels those who obtain surgery (the tying product) to purchase anesthesia services provided by an M.D. anesthesiologist (the tied product). The arrangement in effect precludes patients at the Hospital from choosing to have nurse anesthetists perform anesthesia when undergoing surgery at the Hospital.

---

**14.** Of course, defendants may have had economic interests different than the M.D. anesthesiologists and surgeons, and, in fact, Menaugh may have been acting only on behalf of the Hospital. I conclude only that the evidence before the court gives rise to a reasonable inference that the alleged co-conspirators were not acting as a single economic unit. The fact that some members of the alleged combination may have shared an identical economic interest is beside the point.

In proving that a tie-in arrangement is illegal, a plaintiff must show (1) a tie-in between two distinct products or services, (2) sufficient economic power in the tying product market to affect the tied product market, and (3) that a not insubstantial amount of commerce in the tied market product is affected. *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476, 1479 (9th Cir.1983). Under the reasoning of *Jefferson Parish Hospital*, the Hospital arrangement with the M.D. anesthesiologists is a tie-in between two distinct services, surgery and anesthesia. Thus, the question I must address here is whether defendants have sufficient economic power in the tying product market.[15]

### (a) *Relevant Product Market*

Since market power can only be measured in relationship to a particular product market, the market definition bears directly upon the degree of market power a firm has. Thus, to prove that a defendant has market power, the first crucial step is to establish the bounds of the relevant market. In general, the relevant market is "the area of effective competition" as to a particular product. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). "In economic terms, a 'market' embraces one firm or any group of firms which, if unified by agreement or merger, would have market power in dealing with any group of buyers." II P. Areeda & D. Turner, *Antitrust Law* ¶ 518, at 347 (1978). "[D]efining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

According to Areeda and Turner, the identification of a market in any given case must take into consideration a geographic dimension, a product dimension, and a production dimension. II *Antitrust Law* ¶ 517, at 346. The geographic dimension is the physical area within which the particular product or service is or may be sold to consumers. *See Grason Elec. Co. v. Sacramento Mun. Util. Dist.*, 571 F.Supp. 1504, 1523 (E.D.Cal.1983); II *Antitrust Law* ¶ 522, at 299 (1986 Supp.). The product dimension refers to the availability of products that, because of their similarity to the disputed product, may be used in place of the disputed product. *Grason*, 571 F.Supp. at 1521–23; II *Antitrust Law*, ¶ 517, at 346. Where one product may be easily substituted for another product, "it may be said that the cross-elasticity of demand between them is relatively high, and therefore the two should be considered in the same market." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1271 (9th Cir.1975). To permit the trier of fact to assess cross-elasticity of demand, plaintiff must ordinarily produce evidence of "market data, figures or other relevant material adequately describing the nature, cost, usage, or other features of competing products." *Grason*, 571 F.Supp. at 1521 (quoting *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 919 (8th Cir. 1976)). The production dimension has to do with the capacity of other companies to produce or make available the product or service in response to a price increase by a particular firm. *See* II *Antitrust Law* ¶ 517, at 346. The production dimension is important because a firm's "ability to raise price by restricting output is limited to the extent that other firms can profitably expand their output in response." II *Antitrust Law*, ¶ 519b, at 349. The capacity of a firm to fill the gap in production left by another firm seeking to limit its output is measured by the cross-elasticity of supply.

---

**15.** If the concerted action plainly has some anticompetitive effect, a showing of economic power may not be required. *See NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 108–110, 104 S.Ct. 2948, 2963–65, 82 L.Ed.2d 70 (1984). An analysis of economic power is called for here because there is a complete failure of proof as to whether the exclusion of CRNAs from Manteca Hospital had an anticompetitive effect in a relevant market. *See* section VB1b(2), *infra*.

*See id.; Twin City Sportservice*, 512 F.2d at 1271. Where a firm can easily increase production, or otherwise make the product or service available, the cross-elasticity of supply is said to be high. *See id.*

■ In this case, the relevant market for surgical procedures (the tying product) must be defined. The plaintiff has the burden of proving the scope of the relevant market. *Cf. DeVoto v. Pacific Fidelity Life Ins. Co.*, 618 F.2d 1340, 1344 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980). In the instant case, the main consideration in defining the market is the geographical dimension. *See Jefferson Parish Hospital*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2.[16]

■ It is undisputed that hospitals that are within 30 miles or 30 minutes of each other are in competition with each other. The undisputed evidence also establishes that there are at least five hospitals within 30 miles or 30 minutes of Manteca Hospital that provide surgical services. The market for surgery thus extends at least to those five hospitals which are in direct competition with Manteca Hospital.

### (b) *Market Power*

■ Having established the dimensions of the relevant product market, I next consider whether a trier of fact could draw a reasonable inference that Manteca Hospital had market power in that market. Market power is different than monopoly power. Monopoly power, which is required to prove a section 2 violation, "is the power to control prices or exclude competition" in the relevant market. *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); *Grason*, 571 F.Supp. at 1519. Market power, in contrast, is defined as the power that permits a firm "to force a pur-chaser to do something that he would not do in a competitive market." *Jefferson Parish Hospital*, 466 U.S. at 14, 104 S.Ct. at 1559. Market power can be established by showing that the firm has a predominant share of the market. *United States v. Loew's, Inc.*, 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962). Even if a firm does not have a predominant share of the market, however, it can possess market power if it offers a product that is unique or that has special appeal to consumers. *Id.; see also Digidyne Corp. v. Data Gen'l. Corp.*, 734 F.2d 1336, 1339–41 (9th Cir.1984), *cert. denied*, 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). So long as the "seller can exert some power over some of the buyers in the market, even if his power is not complete over them and over all other buyers in the market," the seller has market power. *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). In the context of a tie-in arrangement, a seller has market power where it is in a position "to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital*, 466 U.S. at 12, 104 S.Ct. at 1558. However, when the buyer of a product is free to buy the product elsewhere, a tying agreement is not illegal. *See id.* at 12 n. 17, 104 S.Ct. at 1558 n. 17.

■ Plaintiff does not argue, and there is no evidence to suggest, that the surgical procedures offered by Manteca Hospital are in some way unique or especially appealing to patients. Accordingly, a trier of fact would have to focus on the Hospital's share of the surgical market to determine whether the Hospital could exert some power over patients in the area as to their choice of an anesthesia provider. The un-

---

**16.** The geographic dimension of the market is arguably the most important consideration since the geographic dimension establishes the boundaries within which a particular product is presently available. In this case, the plaintiff has offered no evidence pertaining to the cross-elasticity of demand, and the court can conceive of no service that could substitute for surgery. In addition, with respect to the cross-elasticity of supply, there is no evidence to suggest that facilities in the area which are not presently offering surgical procedures could provide them. Even without such information, however, the relevant market in this case can be sufficiently defined by identifying the geographic dimension of the relevant product. *See, e.g., Jefferson Parish Hospital*, 466 U.S. 2, 104 S.Ct. at 1553.

disputed evidence establishes that Manteca Hospital does not have a dominant share of the market for surgical services.

There are at least five hospitals that compete with Manteca Hospital by offering surgery: San Joaquin General, Doctors Medical Center, Tracy Community, St. Joseph's—Stockton, and Dameron. According to the undisputed state report addressing market shares, in 1983 Manteca Hospital had 40 licensed medical/surgical beds, and accounted for 8,610 patient days for medical/surgical procedures. In the same year, San Joaquin General, St. Joseph's, and Dameron had a combined total of 465 medical/surgical beds, and together accounted for 118,045 patient days. Even without factoring in the medical/surgical services that were available at the two other known competing hospitals,[17] Manteca Hospital in 1983 had only a 7.9 percent share of the licensed medical/surgical beds available to patients in the area. Further, the 8,610 days that patients spent at Manteca Hospital for medical/surgical procedures represents, at most, only 6.8 percent of the total number of patient days spent at the hospitals in the area for such procedures. In short, whether based on the availability of beds in competing hospitals or the actual number of patient days spent at area hospitals for medical/surgical procedures, it appears that Manteca Hospital has less than a ten percent share of the market. Cf. *Jefferson Parish Hospital*, 466 U.S. at 26, 104 S.Ct. at 1566 (hospital did not possess market power when it attracted only 30 percent of patients residing in geographic market); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 612, 73 S.Ct. 872, 882, 97 L.Ed. 1277 (1953) (newspaper that attracted 40 percent

of sales and classified lineage did not possess market dominance). Plaintiff has certainly produced no evidence to demonstrate a larger market share. Moreover, many patients who live in the vicinity of Manteca go to other hospitals. The vast majority (78.2%) of Manteca Hospital's patients live in the area represented by ZIP code 95336; however, in 1983 nearly 60 percent (58.2%) of patients from that ZIP code area entered other hospitals in the area.

It is obvious from the undisputed statistics before the court that patients in the "area of effective competition" have a wide spectrum of alternatives to the surgical services offered by Manteca Hospital. In no sense can it be said that the Hospital has sufficient economic power in the relevant market to affect the market. The evidence demonstrates that the markets for medical services in general, and surgical procedures in particular, are highly competitive in the area, and consequently, Manteca Hospital does not possess any power to force unwilling patients to accept its services. Any patient who does not like the arrangement at Manteca Hospital can simply go to another hospital. Because Manteca Hospital does not have sufficient economic power in the relevant market, it cannot be held liable for a per se violation of section 1.[18]

### (2) *Rule of Reason*

If a plaintiff cannot show that concerted action is illegal under a per se analysis, he may show that it is illegal under the rule of reason test. To prevail under the rule of reason test, the plaintiff must prove (1) that defendants acted in concert, (2) that the concerted action was intended to harm or unreasonably restrain

---

**17.** The record does not indicate the number of medical/surgical beds or patient days at Doctors Medical Center or Tracy Community Hospital, the two other hospitals known to be within 30 miles or 30 minutes of Manteca Hospital. The record does show that in 1983 Doctors Medical Center had a total of 148 beds licensed for acute care, and that Tracy Community had a total of 59 beds licensed for acute care.

**18.** Even if the Hospital had sufficient economic power in the tying product market, I would conclude that plaintiff could not prevail under a

per se analysis. The third element plaintiff must prove is that the defendants' conduct affected a "not insubstantial" amount of commerce in the *tied* product. The tied product here is the provision of anesthesia services. As I explain below, there is a complete absence of proof regarding the effect of the Hospital's decision on anesthesia services in the market. Moreover, if the Hospital's policy is analyzed as a concerted refusal to deal, the same factors require the same result.

competition, and (3) that the concerted action actually caused an injury to competition. *O.S.C. Corp.*, 792 F.2d at 1469. There is sufficient evidence in the record from which to draw an inference that the defendants acted in concert. *See* section VB1a, *supra*. There is, however, a complete absence of evidence from which a jury could draw a reasonable inference that competition between nurse anesthetists and M.D. anesthesiologists has been harmed.

 Plaintiff has the burden of demonstrating that the defendants' action interfered with competition. *Jefferson Parish*, 446 U.S. at 29, 104 S.Ct. at 1567; *DeVoto*, 618 F.2d at 1344; *see also Cascade Cabinet*, 710 F.2d at 1373 (summary judgment appropriate when plaintiff fails to produce evidence of harm to competition). Although plaintiff has demonstrated that he was injured, injury to the antitrust plaintiff is insufficient to prove injury to competition. *O.S.C. Corp.*, 792 F.2d at 1469. Plaintiff must instead prove that competition in the relevant product market has been harmed in some way. *DeVoto*, 618 F.2d at 1344–45. To prove that competition in a relevant market has been harmed, plaintiff must first prove the existence of a relevant market. *See Jefferson Parish*, 446 U.S. at 29, 104 S.Ct. at 1567; *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 422–23 & n. 14 (11th Cir.1984).

The relevant market discussed above (in the context of the per se analysis) was the market for surgical services. That is because surgery is the product which "ties" anesthesia services. The relevant market for determining the anticompetitive effect of defendants' conduct under a rule of reason analysis is not necessarily the same as the relevant market under the per se analysis. *See Jefferson Parish*, 446 U.S. at 29, 104 S.Ct. at 1567. In this case, it would appear that the relevant market is the market for anesthesia services, not surgical services, since any competition between nurse anesthetists and M.D. anesthesiologists would affect the provision of anesthesia. Plaintiff has completely failed to produce evidence from which an inference can be drawn as to the boundaries of that market.

Defendants have satisfied their burden by pointing out that plaintiff has failed to obtain any expert testimony or discover any other evidentiary basis from which to deduce the boundaries of the market for anesthesia services. *Cf. Forro Precision, Inc. v. IBM Corp.*, 673 F.2d 1045, 1059 (9th Cir.1982) (without benefit of expert testimony or other credible evidence to support an inference of market power from the list of companies and the market share, any such inference would be sheer speculation). Plaintiff's lack of evidence stems largely from his faulty assumption that the relevant market is confined to Manteca Hospital.

As I explained earlier, defining the relevant market requires an examination of the geographic dimension, the product dimension (measured by cross-elasticity of demand), and the product dimension (measured by cross-elasticity of supply). From the evidence before the court, it is simply impossible to infer the geographical boundaries of the market for anesthesia services. While the record suggests that both M.D. anesthesiologists and nurse anesthetists practice at hospitals and clinics in the area, there is no evidence as to the distribution of such providers. The geographic market for anesthesia services may be the same as the geographic market for surgical services, but one simply cannot determine this from the evidence. Similarly, plaintiff has no evidence which addresses the cross-elasticity of demand, that is, the extent to which patients could reasonably substitute other services, such as the services of M.D. anesthesiologists for the services of nurse anesthetists.[19] Finally, there is no evidence which addresses the cross-elasticity of supply.[20]

---

**19.** The circuit's previous decision in this case held that the question of whether CRNAs' services may be substituted for M.D. anesthesiologists' services could not be resolved as a matter of law; thus the issue of cross-elasticity of demand is ultimately one of fact.

**20.** Although plaintiff does not make the argument, it may be that the fact that Bhan was able

Since defendants satisfied their burden in showing that there was a clear absence of evidence on an essential element with respect to which the plaintiff has the ultimate burden of proof, it was incumbent upon plaintiff to produce evidence showing the fact is in dispute. *See Celotex*, 106 S.Ct. at 2552–53. Plaintiff has failed to do so. All plaintiff did in response was to make an unsupported assertion that the market was confined to Manteca Hospital. That position is absolutely without foundation and must be rejected.

Even if there was sufficient evidence to identify the boundaries of the relevant market, there is no evidence which shows that the decision of the Hospital to permit only anesthesiologists to practice had an anticompetitive effect in the market. It may well be that, under the circuit's decision in this case, the Hospital's preclusion of nurse anesthetists from practicing at the Hospital could be unlawful if it foreclosed so much of the market from penetration by nurse anesthetists as to constitute an unreasonable restraint on competition. *Cf. Jefferson Parish Hospital*, 466 U.S. at 30 n. 51, 104 S.Ct. at 1568 n. 51. However, the evidence suggests that some nurse anesthetists presently practice in hospitals and clinics in the area.[21] Moreover, plaintiff has produced no evidence demonstrating that he looked for a position as nurse anesthetist in the area. Finally, most if not all surgeons who practice at Manteca Hospital have staff privileges at other hospitals in the area. There is no evidence to suggest that a surgeon would be prevented from using a nurse anesthetist at another hospital if the surgeon or the patient so desired.

Because there is a complete failure of proof as to the scope of the relevant market and the anticompetitive effect that the Hospital's decision had on the relevant market, I conclude that plaintiff cannot prevail under a rule of reason approach. Because plaintiff has been unable to produce evidence which demonstrates an unreasonable restraint of trade, under either a per se analysis or the rule of reason, the motion for summary judgment as to the section 1 claim must be GRANTED.

### 2. *Section 2 Violation*

Plaintiff also alleges that the defendants violated 15 U.S.C. § 2. *See supra* footnote 5. Plaintiff alleges a monopolization claim, an attempted monopolization claim, and a conspiracy to monopolize claim. To prevail on a monopolization claim under section 2, Bhan must show that defendants (1) possessed monopoly power in a relevant market, (2) willfully acquired or maintained that power, and (3) caused antitrust injury. *Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986). To succeed on an attempted monopolization claim, Bhan must show that defendants (1) had a specific intent to monopolize a relevant market, (2) engaged in predatory or anticompetitive conduct, and (3) that there existed a dangerous probability of success. *Id.* at 1348; *cf. Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.1980) (conspiracy to monopolize similar to attempt to monopolize). A dangerous probability of success can be inferred when the defendant has market power or when the evidence demonstrates that a defendant had a specific intent to monopolize and took specific steps

---

to provide anesthesia services before the termination of the AAS contract provides a factual premise for an inference to be drawn that a CRNA's services are, at least to some extent, a reasonable substitute for an M.D. anesthesiologist's services. Yet the question of whether such services are readily substituted is open to question as a realistic matter. *See Matsushita*, 106 S.Ct. 1348. At least in part this entire case arose because some surgeons did not want to be responsible for the supervision of Bhan, and others felt CRNAs were not competent to provide certain kinds of anesthesia. Since I resolve the question based on plaintiff's complete fail-

ure to address the question of the distribution of anesthesia providers in the market or even the question of the proper measure of the market, I need not resolve the question of the propriety of drawing an inference in plaintiff's favor.

**21.** It is unclear how many nurse anesthetists actually practice in the area. Menaugh, the Hospital Administrator, believed that there was at least one, and possibly three, hospitals which employed nurse anesthetists. In addition, an unspecified number practice in clinics in the area.

to accomplish monopolization. *Inglis*, 668 F.2d at 1029.

Bhan cannot prevail on the monopolization claim because, as noted above, he has failed to provide any evidence of the relevant market for anesthesia services, let alone power in that market. Plaintiff's failure to produce evidence from which the boundaries of the relevant market could be inferred also requires summary judgment on the attempted monopolization claim. Moreover, the evidence shows that, whatever market is a proper measure of the claim, the defendants had no chance of monopolizing that market. For the same reasons, there is a complete absence of evidence to support a claim for conspiracy to monopolize. The motion for summary judgment as to the section 2 claim is GRANTED.

## VI

### PENDENT STATE CLAIMS

Because I have granted summary judgment in favor of defendants as to the federal claims, the pendent state claims should be, and hereby are, DISMISSED. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

IT IS SO ORDERED.